L. M. MORRIS, Plaintiff in Error,

v.

The CITY OF OKLAHOMA CITY; Oklahoma Industries, Inc., a corporation; William Gill, Jr. and Philip J. Rhoads, Trustees of the Oklahoma City Airport Trust; The Oklahoma City Airport Trust; The First National Bank and Trust Company of Oklahoma City, Defendants in Error.

No. 37345.

Supreme Court of Oklahoma.

June 26, 1956.

Rehearings Denied July 17, 1956.

George H. Shirk, Oklahoma City, for plaintiff in .error.

A. L. Jeffrey, Municipal Counselor, City of Oklahoma City, George J. Fagin, Oklahoma City, for defendants in error.

W. A. McWilliams, Oklahoma City, amicus curiae.

. C. .W. Schwoerke, Oklahoma City, for Harlan Bell, intervenor.

. William W. Hayden, Oklahoma City, for B. T. Kirby, intervenor.

HALLEY, Justice.

L. M. Morris, a resident taxpayer of the City of Oklahoma City, filed this original action in this Court for himself and others similarly situated, against the City of Oklahoma City, Oklahoma Industries, Inc., William Gill, Jr., and Philip J. Rhoads, Trustees of the Oklahoma City Airport Trust, The Oklahoma City Airport Trust and the First National Bank and Trust Company of Oklahoma City, seeking an injunction to restrain the defendants from proceeding further in promoting the issuance of $12,000,000 of bonds by the Trustees named, to enable them to construct improvements upon the airports of Oklahoma City, to be leased to the United States for occupancy by the Civil Aeronautics Authority for a period of twenty-five years, the lease to include the improvements to be constructed and all airports now owned by Oklahoma City or acquired during the term of the lease.

This action was filed May 3, 1956. On January 13, 1956, the General Services Administration of the United States issued a binding Letter of Intent, which was accepted by Oklahoma City January 17, 1956, and under the terms of which it was agreed that the City would construct certain permanent facilities at Will Rogers Airport to be leased to the Federal Gevernment for occupancy and use of the Civil Aeronautics Authority.

The buildings and improvements to be constructed include space for offices and laboratory, warehouse and shops, paved outside storage, vehicle parking and railroad siding and utilities. The above improvements are to be completed and leased to the Government for a five year term, with right of renewal for succeeding periods of five years each, not to exceed a total of twenty-five years.

The annual rental rate for such buildings is based upon an amortization of the cost of construction, plus an annual interest rate not to exceed four per cent over a period of twenty-five years, and which shall not exceed $63.36 per annum per $1,000

cost of construction. It was stipulated that the cost of construction has been estimated by reputable architects and engineers to be approximately $12,000,000, and that the Government will invest approximately $18,000,000 in the contents of the buildings to be erected and will bring 800 employees to Oklahoma City with an annual payroll of approximately $6,000,000. The annual rental to be paid by the Federal Government will be approximately $700,000.

To enable Oklahoma City to take advantage of the opportunity offered, the Oklahoma Industries, Inc., a non-profit group, caused to be formed the "Oklahoma City Airport Trust" and deeded to the Trustees a 10 acre tract of land adjoining Will Rogers Airport. The Trust agreement provided that all land, money and property rights coming into the hands of the Trustees, shall be held for the beneficiary, the City of Oklahoma City.

The Oklahoma City Airport Trust was created April 1, 1956, by Oklahoma Industries, Inc. with the City of Oklahoma City as beneficiary, and for the purpose of enabling Oklahoma City to take advantage of the offer of the Federal Government to improve and expand its airport facilities, under the provisions of 60 O.S.1951 §§ 176 to 180, inclusive, as amended, the Oklahoma Trust Act, 60 O.S.1951 § 175.1 et seq. and other statutes.

The Trust has been created for the improvement and operation of airports and air navigation facilities, servicing aircraft and for the accommodation of air travelers; or for the use of aviation agencies of the United States, the State of Oklahoma, municipalities or other subdivision of the Government. The City of Oklahoma City has leased for a term of twenty-seven years its three present airports and agreed to include any airports hereafter acquired during the term of this lease. The City agrees to pay the cost of maintenance, insurance and for damages for personal injuries or property during the term of the lease.

It cannot be disputed that the Trust under consideration is authorized by our

statutes known as the Oklahoma Trust Act, 60 O.S.1951 § 175.1 et seq., and Sections 175.2 and 171 provide as follows:

"A trust in relation to real and personal property, or either of them, may be created for any purpose or purposes for which a contract may be made."

"Express trusts may be created in real or personal property or both, with power in the trustee, or a majority of the trustees, if there be more than one, to receive title to, hold, buy, sell, exchange, transfer and convey real and personal property for the use of such trust; to take, receive, invest or disburse the receipts, earnings, rents, profits or returns from the trust estate; to carry on and conduct any lawful business designated in the instrument of trust, and generally to do any lawful act in relation to such trust property which any individual owning the same absolutely might do."

Our general law in regard to Trusts for the furtherance of public functions was amended in 1953. Section 176, as amended, is as follows:

"Express trusts may be created in real or personal property, or either or both, or in any estate or interest in either or both, with the State, or any county, municipality, political or governmental subdivision, or governmental agency of the State as the beneficiary thereof, and the purpose thereof may be the furtherance, or the providing of funds for the furtherance, of any authorized or proper function of the said beneficiary. Provided, that no funds of said beneficiary derived from sources other than the trust property, or the operation thereof, shall be charged with or expended for the execution of said trust, except by express action of the legislative authority of the beneficiary first had. The officers or any other governmental agencies or authorities having the custody, management or control of any property, real or personal or both, of the beneficiary of such trust, or of such a proposed trust, which property shall be needful for the execution of the trust purposes, hereby are authorized and empowered to lease such property for said purposes, after the acceptance of the beneficial interest therein by the beneficiary as hereinafter provided, or conditioned upon such acceptance."

Section 177, of the above Act, provides for the acceptance by governing body of municipalities and the recording of such instrument.

The trust property here consists of the land conveyed to the Trust by the Trustor, a lease by the beneficiary, City of Oklahoma City, of airports and airport properties owned by the City of Oklahoma City and leased by the City to the Trustees, and all income accruing during the life of the Trust, or until the Trustees' bonds have been retired or retirement fully provided for. The plaintiff claims that the indebtedness proposed to be incurred by the Trustees violates Sections 23, 25, 26 and 27, Article X of our State Constitution.

Prior to the filing of briefs by the plaintiff and defendants these parties entered into a stipulation of facts which is considered important in that it eliminates controversy as to the facts involved and leaves for our consideration the questions of law presented by the plaintiff and the defendants and those who have intervened. We shall recite here the substance of the first four sections of the stipulation and copy in full Sections 5 and 6.

1. It is first agreed that the United States, through the General Services Administration, issued a binding Letter of Intent on January 13, 1956, and accepted by Oklahoma City January 17, 1956, under the terms of which permanent facilities are to be constructed at Will Rogers Airport and leased to the Government for occupancy by the Civil Aeronautics Authority. Such facilities to consist of office and laboratory space and for other purposes above mentioned.

The above facilities will be leased to the Government for five years with right of renewal by the Government for successive periods of five years each, the entire term not to exceed twenty-five years.

The annual rental for such improvements when construction is completed shall be based upon amortization of construction costs, plus an annual rental rate not to exceed four per cent over a period of twenty-five years, and that shall not exceed $63.36 per $1,000 of cost of construction, plus an agreed amount to cover estimated cost of insurance and structural maintenance. The amortization rate is based upon monthly rental payments. When required, the City is to construct additional hangar space to be leased upon terms similar to those of the original facilities.

2. Reputable architects and engineers have estimated costs of proposed improvements at approximately $12,000,000. The City of Oklahoma City has no funds available for such purpose, and the Public Trust Law, 60 O.S.1951 §§ 176 to 180, as amended, and the Oklahoma Trust Act are being utilized to enable the making of such improvements and the proposed contract with the Federal Government to be carried out.

3. Attached to the plaintiff's petition are copies of (a) Trust Indenture between Oklahoma Industries, Inc., a corporation, as Trustor and William Gill, Jr. and Philip J. Rhoads as Trustees of the Oklahoma City Airport Trust; (b) Ordinance No. 7765, enacted April 24, 1956, by the City Council of Oklahoma City and affidavit of publication; (c) Lease Agreement dated April 25, 1956, between Oklahoma City and the Trustees named; (d) Bond Indenture dated April 1, 1956, between the Trustees and the First National Bank and Trust Company of Oklahoma City.

4. That approximately $12,000,000 of bonds will be issued by the Trustees, depending upon the exact cost of construction; that interest of Trustees' bonds during the period of construction will be capitalized for a period of 18 months; that a Reserve Fund to be created over a period of two years will be approximately $840,000, which is for the purpose of securing payment of principal and interest of bonds should it be necessary to prevent default; that this Reserve and Construction Account are to be invested in United States Government Bonds which today would yield three per cent interest per annum and believed to yield a minimum of two and one-half per cent during the life of the bonds.

Paragraphs 5 and 6 of such stipulation are copied in full:

"5. Reputable accountants have approved the following statistical information:

"(a) In setting up this $12,000,000 bond issue at a 4% coupon rate with mandatory call for redemption each six months as rapidly as funds accumulate in the Sinking Fund, the said bonds can be retired by the Trustees from a 25-year amortization schedule as required by the Civil Aeronautics Authority.

"(b) Calculating the reserve balance to be invested at 2-1/2% all bonds will be paid at the end of twenty-five years from the said $63.36 per thousand annual rental payments and will leave an accumulated balance after all bonds are retired in the amount of $325,745.

"(c) The total expense of the Trust over the entire period or life of the bond issue will amount to a sum approximately $237,500; which in turn leaves an unexpended balance of $88,245.

"(d) That although the City Manager (whoever may hold the office) is a Co-Trustee, he receives no compensation or remuneration whatsoever.

"(e) In the event the Reserve Fund is invested (as can be done today to yield 3% per annum) there would be an additional income of $95,000.

"(f) The Construction Account which arises from the proceeds from the sale of bonds can also be invested in short-term Government securities

during the construction period, yielding from such investment an income of $75,000 to $100,000.

"(g) Therefore, taking the unexpended accumulated balance of $88,245 from the bond schedule and an additional estimated amount of $95,000 from the ½ of 1% additional invested income ·rate plus another minimum amount of $75,000 interest income from the Construction Account would leave a net accumulated unexpended balance which would go to The City of Oklahoma City (the beneficiary of the Trust) on termination of the Trust of a sum of $258,245—none of which has been from city-owned property and all has been accumulated as a result of rentals and interest income received entirely from the. Civil Aeronautics Authority facilities."

"6. That the Civil Aeronautics Authority of the United States had advised the City that approximately 800 persons will be moved to Oklahoma City as permanent employees on said facilities with an annual payroll of approximately $6,000,000. That approximately $18,000,000 will be invested by the United States of America in the contents of said facilities."

In view of the foregoing stipulation, it appears that the rental to be paid to the Trustees by the Civil Aeronautics Authority and interest income will not only pay the proposed bonded indebtedness, the cost of operations and all expenses of the Trust, but would leave a net balance accumulated unexpended at the close of the Trust period of $258,245, which would go to the beneficiary, the City of Oklahoma City. This balance of accumulated income would result entirely from rentals and interest income secured from the Civil Aeronautics Authority and investments in Government Bonds.

It may be argued with reason that the five year term of the lease agreement may not be renewed each five years for the entire twenty-five years. Since the Civil Aeronautics Authority has agreed to invest $18,000,000 in equipment to be placed in the leased premises, and move 800 employees to Oklahoma City, with an annual payroll of approximately $6,000,000, it seems that the danger of failure to renew the lease for the entire twenty-five years is remote.

Plaintiff submits that the Trustees are "Agents of the State" and that since the indebtedness of the Trustees here is of the type prohibited by Sections 23, 25, 26 and 27 of Article X of our Constitution, they are therefore void and that the Public Trust Law purporting to authorize such indebtedness is unconstitutional.

█ The cases cited by the plaintiff in support of this contention are not applicable here. This court recently held in Board of County Commissioners of Oklahoma County v. Warram, Okl., 285 P.2d 1034, 1035, that such indebtedness is not unconstitutional. In the first, third and seventh paragraphs of the syllabus it is said:

"A valid trust in property, with a governmental entity as beneficiary, may be created for the furtherance, or the providing of funds for the furtherance, of any public function which the governmental entity might be authorized by law to perform; * * *."

"Trusts for the benefit of governmental entities are 'charitable trusts'; and the common law recognizes that the purposes for which such trusts may be established include a broad field of objectives for the benefit of a large class of the public or for lessening the burdens of government."

"The trustees of trusts for the furtherance of public functions being by law a state agency, indebtedness incurred by them and payable solely from the trust estate and its revenues, is not violative of Article X, sections 23 and 25 of the Constitution; and the fact that such trustees also are designated as regularly constituted authorities of a beneficiary governmental subdivision

does not violate sections 26 and 27 of Article X of the Constitution."

In In the Matter of Application of Oklahoma Planning and Resources Board for the Approval of Bonds, Okl., 274 P.2d 61, it was held that Park Bonds payable from the operation of State Parks were not violative of any constitutional provisions. The Court followed an earlier decision in In Re Application of Oklahoma Planning and Resources Board, 201 Okl. 178, 203 P.2d 415, 417, in which it was said:

"The first question presented is whether said bonds, if issued, constitute an indebtedness of the State of Oklahoma in violation of section 23, Art. 10 of the Constitution as amended and approved on March 11, 1941, and sections 24 and 25, Art. 10 of the Constitution. These sections prohibit the contracting of debts against the state, and have been held to apply only to debts, obligations or deficits for the payment of which resort might properly be had to the taxing power of the state. Graham v. Childers, 114 Okl. 38, 241 P. 178. They do not prohibit the incurring of indebtedness payable only out of a special fund, which indebtedness is not, and cannot, become a debt of the state payable out of taxes levied by the state. The right of the Legislature to provide for the carrying out of self liquidating projects by state agencies has been upheld in numerous cases. Sheldon v. Grand River Dam Authority, 182 Okl. 24, 76 P.2d 355; Baker v. Carter, 165 Okl. 116, 25 P.2d 747; In re Application of Board of Regents for Oklahoma Agricultural and Mechanical Colleges, 196 Okl. 622, 167 P.2d 883."

■ Plaintiff submits that the Trust instruments are invalid because the City of Oklahoma City in leasing its airports to public trustees, including income therefrom, has violated Sections 26 and 27, Article X of our State Constitution, without a vote authorizing such indebtedness. Section 26 of Article X expressly provides that "No

* * * city * * * shall be allowed to become indebted * * * to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters * * *."

Plaintiff states that he will present his principal argument under this proposition. It should be kept in mind that the instruments involved, including the lease of its airports by the City, all expressly provide that the bonded indebtedness shall never become an obligation of the State nor of the beneficiary, Oklahoma City.

The fact that the City of Oklahoma City has leased its airports to the Public Trustees, including income therefrom, is not violative of the Oklahoma Constitution. Any income resulting from leased property is only incidental to and a necessary part of the authority to lease the property to the Public Trustees.

■ The pledging of the payment of the Trustees' Bonds and Trust expenses from the revenues of the Trust Estate as set out in the lease agreement and as defined in the bond indenture does not violate the provisions of sections 26 and 27, Article X of the Constitution.

The airports and all of their present facilities are not being mortgaged to secure the payment of the bonds. Only the lease by the City to the Trustees is an obligation resting upon the City. The lease by the City to the Trustees provides that it shall cover only the facilities upon the land owned by the City and that only the ten acres of land deeded to the Trustees and the Civil Aeronautics Authority facilities is covered by the lien to secure the payment of the bonds.

The Lease Agreement between Oklahoma City and the Trustees is necessary for carrying out the purposes of the Trust. The Trustees agree to operate the Trust Estate in a good and efficient manner; to report annually and secure the approval of the City Authorities as to the terms of any proposed contract or lease and the fees to be charged by the Trustees. The Trustees

agree not to mortgage or permit to be mortgaged the title of the City to any part of the leased real estate of the City or to permit any such property to be charged with the payments of any obligation of the Trust.

The City does agree to co-operate with the Trustees and to pay expenses incident to operation and maintenance of its airports. This obligation rests upon the City in any event. The Lease Agreement provides that improvements placed upon leased property shall be deemed personal property and that upon payment of the Trust indebtedness title to all Trust property shall become vested in Oklahoma City.

Section 1, Article I of the Charter of Oklahoma City provides that the City may secure property and hold, lease, mortgage, convey or otherwise dispose of any of its property real or personal.

Section 65.4, 3 O.S.1951, provides that every city may by sale, lease or otherwise, dispose of any airport, air navigation facility or other property.

The Public Trust Act under which the Trust bonds are here issued, authorizes the lease agreement here involved. Section 176, above quoted, provides that an express trust may be created in real or personal property, with the State or any municipality as beneficiary thereof, the purposes of which may be the providing of funds for the furtherance of any authorized or proper function of such beneficiary, provided that no funds of the beneficiary derived from sources other than the trust property or the operation thereof, shall be charged with or expended for the operation of said trust except by express action of the Legislative authority of the beneficiary first had. It expressly provided that the officers of a City may lease such property for such purposes after the acceptance of the beneficial interest therein by the beneficiary.

The foregoing provisions remove any doubt as to the authority of Oklahoma City to lease its airports as is here proposed to be done.

In Atlas Life Insurance Company v. Board of Education of City of Tulsa, 83 Okl. 12, 200 P. 171, this Court upheld a 99 year lease by a school district. The first paragraph of the syllabus is as follows:

"Municipal corporations possess the incidental or implied right to alienate or dispose of the property, real or personal, of the corporation of a private nature, unless restrained by charter or statute."

In Robinson v. Hal Johnson & Co., 206 Okl. 397, 243 P.2d 657, 659, this Court sustained the validity of a lease of an entire city airport for 49 years for a rental of $1.00 per year, with an option to renew the lease for an additional 49 years. The City of Shawnee relied upon the Municipal Airports Act, 3 O.S.1951 §§ 65.1 to 65.22, enacted in 1947, and especially Section 65.4 of such Act. In the body of the opinion it was said:

"In 1947 the Legislature adopted a comprehensive Municipal Airports Act, 3 O.S.1951 §§ 65.1–65.22. It ratified and validated prior acquisitions, actions and bond issues dealing with municipal airports, sec. 65.11. Specific authority for the sale, lease or disposal of airport property was granted in sec. 65.4. Except as limited by the terms and conditions of any grant, loan or agreement with the State or Federal governments the municipality was authorized to dispose of an airport by sale or lease in accord with the provisions of the laws of the State or the provisions of its charter, governing the disposition of other property of the municipality. This entire Act is silent as to any requirement of first submitting the disposal of airport property to a vote of the people, and we hold that no such submission is necessary."

In Christopher v. City of El Paso, 98 S.W.2d 394, it was held by the Court of Civil Appeals of Texas that terms of a statute authorizing cities to acquire municipal airports do not prohibit leasing by

cities of property acquired for airport purposes.

We find no merit in the contention of plaintiff that the instruments here involved are invalid under Section 17, Article X of our Constitution, which is as follows:

"The Legislature shall not authorize any county or subdivision thereof, city, town, or incorporated district, to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or levy any tax for, or to loan its credit to any corporation, association, or individual."

Certainly there has been no statute enacted which authorizes the City of Oklahoma City to become a stockholder of any company, association or any corporation, and such question is not involved in this case. In the case of Murray v. Tyndall, 223 Ind. 641, 63 N.E.2d 703, it was held that a municipality having authority to acquire and improve aviation facilities had authority to make a lease to the Federal Government for the purpose of developing air transportation.

It is further contended that the Trust here involved does not come within the intent and provisions of the Public Trust Act, contained in 60 O.S.1951 §§ 176 to 180, as amended. A careful examination of the Trust Indenture, Ordinance accepting the same, Lease Agreement and Bond Indenture discloses a substantial compliance with the Public Trust Act above mentioned. We think the provisions of such Act have been fully complied with.

The injunction of the plaintiff is hereby denied and the Trust Indenture, Ordinance of the City of Oklahoma City accepting the same, the Lease Agreement and Bond Indenture herein referred to and all instruments incident to the Oklahoma City Airport Trust, including the Bonds issued thereunder are hereby held to be valid and binding instruments.

This Court has assumed original jurisdiction of this matter because it is clearly a matter affected with the public interest and the instruments before us disclosed the urgency of a prompt decision of the issues presented by the plaintiff.

JOHNSON, C. J., and WELCH, CORN and HUNT, JJ., concur.

WILLIAMS, V. C. J., and DAVISON, BLACKBIRD and JACKSON, JJ., dissent.

JACKSON, Justice (dissenting).

Plaintiff is not entitled to an injunction to restrain further proceedings in connection with the proposed bond issue but is entitled to an injunction against the execution of any proposed contracts that violate the Oklahoma Constitution.

The majority opinion states:

"The City agrees to pay the cost of maintenance, insurance and for damages for personal injuries or property during the term of the lease. * * * When required, the City is to construct additional hangar space to be leased upon terms similar to those of the original facilities. * * * The City does agree to co-operate with the Trustees and to pay expenses incident to operation and maintenance of its airports. This obligation rests upon the City in any event."

It will be observed from the majority opinion that these obligations to pay expenses incident to operation and maintenance, insurance premiums, and the construction of additional hangar space is to continue for a period of twenty-seven years. I am of the opinion that these obligations create a debt in an amount exceeding, in any year, the income and revenue provided for such year, and are in violation of section 26, article 10, Oklahoma Constitution. I have carefully examined the opinion and the syllabi and do not find that the opinion has specifically settled that issue.

The opinion does say "This obligation rests upon the City in any event." No authority is cited. This conclusion is obviously made without careful consideration. There is no legal requirement that a city own an airport. There is certainly no legal obligation on any municipality to

continue to own or to operate and maintain an airport if it is a losing proposition year after year. Since there is no obligation upon the city to own and operate an airport how can it be said it is under an obligation to pay expenses incident to operation and maintenance of its airport? If this is a legal obligation resting upon the city there is no necessity for placing it in the contract.

It must be observed that the majority opinion cites prior decisions of this court having to do with financing of State Institutions. They deal with state indebtedness and an interpretation of sections 23, 24, and 25, art. 10, Oklahoma Constitution, and are not decisive of the constitutionality of the proposed contract. Constitutional provisions limiting municipal indebtedness are found in secs. 26 & 27, art. 10, Oklahoma Constitution. The majority opinion fails to discuss these provisions and our former opinions in connection therewith.

If in the future the city officials should decide for any reason not to pay the insurance premiums and expenses of operation and maintenance it may then become apparent that these are not legal obligations.

In City of McAlester v. State ex rel. State Board of Public Affairs, 195 Okl. 1, 154 P.2d 579, the city officials concluded that their contract to supply water to the State Penitentiary was in violation of sec. 26, art. 10, Oklahoma Constitution, and threatened to discontinue the service. This court there held:

> "A contract entered into between the State Board of Public Affairs and the city of McAlester whereby the former agrees to furnish all work and labor necessary to the construction of an extension of the water system of the city in consideration for water to be furnished at the city's expense to a state institution over a period of years at a specified price per gallon, to be credited against the cost of such work and labor until fully discharged, constitutes a charge against the municipality's funds beyond the current fiscal year, and, in the absence of assent of the voters of said city as provided by section 27, article 10, Constitution, is void." (Evidently meaning Section 26 of Art. 10).

In the body of the opinion it was said:

> "The record reveals that the finances of the city were pledged far beyond the current fiscal year for the purpose of supplying water to the penitentiary. Those finances were in the form of future expenses in furnishing the water. * * * The funds necessary to such operation were pledged far beyond the fiscal year, funds not yet in existence, and the contracts were void."

I see no legal distinction between the contract in the McAlester case and the contract here.

For the reasons stated, I must respectfully dissent.

BLACKBIRD, Justice (dissenting).

I cannot concur in the majority opinion denying the injunction. I regard the Trust Indenture, Ordinance, Lease Agreement and Bond Indenture involved as parts of a scheme to circumvent the Oklahoma Constitution. Under the latter's Art. X, sections 26 and 27, a municipal election must be held before any incorporated city, such as Oklahoma City, can become indebted *"in any manner, or for any purpose, to an amount exceeding, in any year" its income and revenue for that year*. I believe all would agree that under the proposed plan, of which each of the above constitutes a documentary part, the City, through a Trust, is attempting to do indirectly what it, itself, cannot do directly under our Constitution; and, by such circumvention, the spirit, if not the letter, of that document's provisions is violated. Though trite, it is not inappropriate to remember that such a bulwark to democracy and local self-government may be rendered quite as meaningless and ineffectual by circumvention, as by direct violation. When, as under those portions of

our Constitution, the authorized debt limit is fixed in terms of revenue, it seems to me that a city exceeds that limit just as truly by giving up part of its existing revenue and keeping its indebtedness at its existing level, as by keeping its existing revenue and incurring increased indebtedness; and, in turning over to this proposed "Airport Trust" its present revenue (and that for years to come) from the Will Roger's airport facilities, Oklahoma City, or rather a segment of its officialdom, is doing just that. In other words, when debt limit is fixed in terms of equality of revenue to indebtedness, it makes no difference whether the indebtedness is increased, or the revenue is decreased, the result is the same—the indebtedness becomes greater than the revenue and the taxpayer must foot the bill for the difference. The cited provisions of the Constitution provide that before this occurs, he, the taxpayer, must give his assent to it, but that has not been done in the case of the proposal before us. It is conceded, as plaintiff points out, that: "Except for the plan here contemplated the revenues from the airports would be available for general purposes or for the ordinary budget of Oklahoma City."

In the past, this Court has consistently struck down devises to circumvent these provisions of the Constitution, its latest stand being made in Application of City Council of City of Tahlequah, Okl., 285 P.2d 418, which involved bonds proposed to be issued by Tahlequah to pay for a natural gas distribution system—a proposal that would doubtless have been comparatively more essential, and perhaps even more beneficial, to the future growth and well-being of that city, than the airport expansion proposal involved here, would be to Oklahoma City. There, we followed a long list of cases, involving attempts by other Oklahoma cities to exceed the constitutional debt limit, *in steadfastly applying the rule that where the Constitution provides the means and manner of doing that, such means and manner is exclusive, and must be strictly followed.*

We should not allow our attention to be diverted from the contravention of these provisions by the fact that, according to the plan, the proposed bonds will be retired from the income of the Trust which it is hoped will continue at a high enough level, long enough, to accomplish such retirement. *Under the plan, not only is a portion of Oklahoma City's existing income,* together with use of the airport facilities which earn it, taken away from the City for a period of years and handed over to the Trust for the purpose of helping it retire the bonds it will issue, but *the City is further obligated to make new expenditures, not met by present annual revenue,* over a possible period of twenty-seven years, as shown by both the majority opinion and the dissenting opinion of Justice Jackson. I can see no difference, in reality, or on principle, between this "robbing of Peter to pay Paul" and a plan that would contemplate Oklahoma City's keeping that income, but going into debt directly to make the proposed airport improvements. The only real difference between the two (and the thing that the plan has been devised to obviate) being that, in the latter situation, the matter of issuing the bonds and incurring the indebtedness would have to be voted on by the taxpayers. Nor do I think that, under the previous decisions of this Court, it makes any difference that the bonds will be retired partially from what will, in name, be Trust revenue (instead of Oklahoma City revenue, as formerly) rather than from municipal taxation. Defendants' argument aimed at diverting our attention from the proposed contravention of Art. X, sections 26 and 27, by showing that two other sections of Art. X are not violated, is rewarded in the majority opinion by the inclusion of two state agency cases they cite, both Oklahoma Planning And Resources Board cases. One of them, 201 Okl. 178, 203 P.2d 415, is quoted to the effect that sections 24 and 25 apply only to obligations to be paid out of taxes and do not prohibit incurring debts that are payable exclusively from a special fund. As indi-

cated in the dissenting opinion of Justice Jackson, and conclusively demonstrated by numerous cases cited by plaintiff, including the Tahlequah case, supra [285 P.2d 421], this rule does not apply to city cases. In the cited case, we said:

"* * * Municipalities are limited and restricted by the provisions of Art. X, section 27, * * * which has no application to the state. * * *"

The reason that state agencies may issue self-liquidating bonds under sections 24 and 25 (when authorized by legislative enactment), while, under sections 26 and 27, municipalities cannot, is lucidly explained in 3 Okla. Law Rev., at page 338, as follows:

" * * * a political subdivision, such as a municipality, has no residuary power. All power possessed by a municipality is derived from specific grants by the constitution or legislature. Therefore, a grant of power by the constitution to the municipalities to create a debt is the exclusive means by which the debt may be created. 'The municipal subdivisions can, in the exercise of their contractual power, do only those things which incur an expenditure of public funds which are expressly authorized by the Constitution and statutes of the state, whereas, the rule governing the sovereign is entirely to the contrary. The sovereign speaks through its legislative body * * * *which has no limitations as to expenditures,* save and *except those which are expressly placed* on its exercise by the Constitution * * *'* Therefore, the provisions of Sections 23, 24, and 25, Article 10 of the Constitution are merely limitations upon the power of the legislature to create 'debts' of the state, and without a direct or indirect violation of these provisions, the legislature may exercise its prerogative in financing facilities of the state. On the other hand, the provisions of Sections 26 and 27, Article 10 of the Constitution are *merely grants*

of powers to municipalities, and the *exclusive* means by which the municipalities may carry on financial operations." (Emphasis ours.)

And, in Zachary v. City of Wagoner, 146 Okl. 268, 292 P. 345, 348, this Court said:

"We are not unmindful of the rule followed in some jurisdictions that the purchase of property does not create an indebtedness if the purchase price is to be paid out of the income therefrom [citing cases] but we cannot follow such holding. In our opinion, this is but another attempt to nullify and evade the wholesome constitutional limitations upon the power of municipalities to create indebtedness and to usurp powers never intended to be granted to municipal officers. The reasoning in support thereof is the ingenious argument by which such attempts have ever been supported. Under the decisions of this court and the Constitution and laws of Oklahoma, the agreement * * * creates an indebtedness no matter from what source the funds are to be derived from which the payment is to be made. Sections 26 and 27, article 10, supra, contain nothing that limits their application to indebtedness to be paid from funds derived from ad valorem tax levy. They are general in their terms and they will be applied by this court to *all manner of indebtedness, no matter how created or from what source the indebtedness is to be paid.* As well might a municipality contend that an indebtedness was not an indebtedness because it was to be paid from receipts from gross production tax or other sources of income other than ad valorem taxation. We cannot give our approval to any such theory of the law." (Emphasis ours.)

Nor do I think the Legislature intended that the Oklahoma Trust Act, Tit. 60 O.S. 1951 § 175.1 et seq., should ever be used (as it is herein proposed to do) to violate

or circumvent our Constitution. It took the precaution of inserting in said Act the provision, sec. 176, that no funds of the Trust's beneficiary from sources other than Trust property, or the operation thereof, shall be charged with *or expended for the execution of the Trust* without action of the beneficiary's legislative authority. And, under Art. V, sec. 53 of our Constitution not even the city's legislative authority, the city council, can abate, commute, reduce or forgive tax obligations due the city; so, how is it that it can turn over to a Trust, without compensation or remuneration (if the income of the Trust turns out to be insufficient to more than pay the expenses thereof and the bonded indebtedness) property it has acquired with the proceeds of such tax obligations? In this connection, see Ivester v. State ex rel. Gillum, 183 Okl. 519, 83 P.2d 193, in which we cited, and quoted with approval, City of Louisville v. Louisville Ry. Co., 111 Ky. 1, 63 S.W. 14, 17, 98 Am.St.Rep. 387. The latter case quoted from Agnew v. Brall, 124 Ill. 312, 314, 16 N.E. 230, 231, in part, as follows:

" 'They (city council) have no power to squander or give away the funds and property of the incorporation, but all property within their control belonging to the incorporation must be honestly applied to the uses and purposes specified in the act of incorporation. The city council have no power to sell or in any manner dispose of the property of the corporation without consideration * * *.' "

There the court goes on to show that what a municipal legislative body cannot do directly, it cannot do indirectly. Of course, in the plan before us, the city does not sell or dispose of any airport facilities but it relinquishes, to the proposed Trust, the income therefrom. As said in State ex rel. Campbell v. Cincinnati Street Ry. Co., 97 Ohio St. 283, 119 N.E. 735, 742:

" * * * the control of the income is the thing that will give substance and effect to the credit and financial power of those controlling or receiving

it. *It is the income that gives value to such a property as this.* From the nature of the property, its purposes and uses, *a pledge of the income is a* pledge of the capital." (Emphasis ours.)

I do not think that, under our Constitution, the city council has the power to give away any part of the city's revenue in the manner proposed—and it may well be a "give-away", if the Trust's future income happens to fall very far short of the optimistic estimate upon which the plan's proponents rely so heavily for its approval. That this will be the result only in such event, or contingency, in my opinion, makes no more difference than it would if the City did "not become obligated (to pay off the bonds) until the happening of some contingency * * *". See City of Tulsa v. Langley, 196 Okl. 680, 168 P.2d 116, 117. In that case, we held:

"The constitutional limitation on indebtedness established by Section 26 of Article 10 of the Constitution of the State of Oklahoma applies to transactions *connected with* a municipally owned and operated * * * public utility when the method of operation is such that the funds derived from its operation are *directly or indirectly connected with* taxation and the transaction involved is not *clearly severable* and *self liquidating.*" (Emphasis ours.)

In that case, we quoted from Iron Products Investment Co. v. City of Picher, 10 Cir., 83 F.2d 443, 446, in part as follows:

" 'Furthermore, the waterworks system was acquired through general obligation bonds which are a direct burden upon the taxpayers of the City. See Perrine v. Bonaparte, 140 Okl. 165, 282 P. 332, 334. Debts created in excess of the annual income and revenue of the City, although payable solely from revenue of the waterworks, would cast an *incidental burden on the taxpayers* of the City and would be within the limitation of Section 26, supra. [Citing cases.]' "

Defendants (albeit "left-handedly") concede, as they must, that the present case is different from the cases of Robinson v. Hal Johnson & Co., 206 Okl. 397, 243 P.2d 657, and Board of County Commissioners of Oklahoma County v. Warram, Okl., 285 P.2d 1034, relied on in the majority opinion in its holding that the plan in question is authorized by the Oklahoma Trust Act, in which it plainly appears that none of the funds or income of the Trusts involved had their origin in public funds. Their only answer to this is that: "In some of the cases where leasing of the facility was approved * * * rentals theretofore received by the municipality would pass to the lessee." Then they further say: "It certainly must be obvious that any airport or other business utility would yield to its owner some revenue, whether large or small, and whether disclosed by the opinions or not." In view of what I have just said concerning the two Oklahoma cases involved, the quoted statement can only be considered as recognition by the defendants, themselves, of the weakness of their position, and at the same time, it constitutes a tacit concession of the weakness of the majority opinion's only footing or foundation. As far as I have been able to ascertain, the only cases defendants cite wherein public funds were turned over to the Trusts involved are from other jurisdictions not subject to application of constitutional provisions that have been construed as have those sections of our Constitution involved here, always been construed by this Court.

In view of the foregoing, I would hold invalid and unconstitutional the plan submitted, and, accordingly, grant the injunction. In ruling contra, this Court is setting a dangerous precedent that may well prove the "opening wedge" in breaking down our Constitution's protection of taxpayers against the dissipation, divestation or diversion of their municipality's revenue and the incurring of potentially "back-breaking" or bankrupting municipal indebtedness; for, if that stalwart document can be circumvented in Oklahoma City for the purposes involved here, the same can be done in other state cities for a variety of different purposes, and/or excuses, with the result that the portions of the Constitution herein cited will, in effect, have been amended, repealed or emasculated without the electorate ever having had any direct voice in the matter.

Granting the injunction would not necessarily stand in the way of accomplishing the ends sought by the plan involved here. If those ends are good and economically feasible, Oklahoma City's voters would probably give their approval to incurring further bonded indebtedness to accomplish them. But, whether they be good or bad, their accomplishment should be regulated by the will of the people, rather than by this Court's approval of a device to circumvent that will. Where the Constitution provides the manner and means, "such manner and means is exclusive." Application of City Council of City of Tahlequah, supra.

I therefore respectfully dissent.

DAVISON, Justice (dissenting).

In every opinion adopted by this court since statehood we have construed sections 26 & 27 of Article 10 of our State Constitution as self-executing and have over the years, without exception, given said sections a strict construction. These sections of the Constitution expressly prohibit the agreement contemplated by the defendants. In my opinion the majority of my associates have by the present opinion, over-ruled a number of cases without discussing or mentioning any of them.

The pertinent part of section 26, Article 10, reads as follows:

"No county, city, town, township, school district, or other political corporation, or subdivision of the State, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters thereof, voting at

an election, to be held for that purpose. * * * "

The act of the City in leasing its airports, which in effect constitutes a pledge of the revenues therefrom, violates the above section of the constitution, in that the city attempts to become indebted in an amount exceeding the revenue provided for any year without the assent of the voters thereof, and is void. This is true under the agreement of the city to pay the cost of maintenance, insurance and for damages for personal injuries or property during a prospective period of twenty-seven years.

Some of the leading cases which would invalidate the agreement involved herein as being unconstitutional are as follows: City of Tecumseh v. Butler, 148 Okl. 151, 298 P. 256; City of Tulsa v. Langley, 196 Okl. 680, 168 P.2d 116; Zachary v. City of Wagoner, 146 Okl. 268, 292 P. 345; City of McAlester v. State ex rel. Board of Public Affairs, 195 Okl. 1, 154 P.2d 579; Burch v. City of Pauls Valley, 201 Okl. 78, 201 P.2d 247; In Re The Application of City Council of City of Tahlequah, Okl., 285 P.2d 418, 421.

The majority opinion relies on prior decisions of this court pertaining to the financing of State Institutions and State Parks. These decisions are inapplicable here due to the fact that the State is not limited by sections 26 and 27 of Article 10, supra. The sections pertain to cities and other political corporations or subdivisions of the State but not to the Sovereign State. This was completely demonstrated in the case of In Re Application of City Council of City of Tahlequah, supra, written by the author of this dissent, wherein we definitely pointed out the distinction between proceedings concerning self liquidation indebtedness of the Sovereign State, and proceedings involving municipalities. In that opinion we said:

"The views and argument herein expressed have no application to proceedings concerning self liquidation indebtedness of the sovereign state for the reason that municipalities are limited and restricted by the provisions of Art. X, section 27, of the Constitution which has no application to the state. This distinction was recognized in the quotation from the Burch case, supra."

The decisions of this court have been uniform in determining that a special revenue bond issue of the State of Oklahoma to be valid do not have application to a similar proceeding by a municipality. Such an act or proceeding involving a municipality to be valid must fall within the provisions of sections 26 or 27, supra. See, also, Law Review, comment in 3 Okla. Law Review, page 337 for a good discussion covering the distinction made herein.

The majority opinion also relies on the case of Board of County Commissioners of Oklahoma County v. Warram, Okl., 285 P.2d 1034. This opinion is not applicable here. There the court upheld the Public Trust Law and permitted the issuance of "revenue bonds" by the Trustee of the Trust. However, in doing so it was recognized that there was no debt created by the Trustees that even became an obligation of Oklahoma County, the beneficiary. Such is not the case here for the reasons hereinbefore stated.

No doubt the city council thought the execution of the agreement involved herein was for the best interest of the city. Every member of the City Council who was present at the meeting held for such purpose voted in favor of the agreement. Apparently each member voted his honest conviction and from a business standpoint were guided in the thought that their actions would be beneficial to Oklahoma City in many ways. I do not doubt the wisdom of the members of the City Council in voting for the agreement and I am of the opinion that the execution of and the carrying out of the same to its ultimate conclusion would be advantageous to the growth and prosperity of Oklahoma City. However, courts do not and should not concern themselves with the expediency or wisdom of laws, but only with their legality.

The majority opinion has driven a wedge into Sections 26 & 27 of Article 10 so that a precedent has been made for future city councilmen in this and other cities to follow. Perhaps many future city councilmen in this and other cities will not have the wisdom possessed by the members of the present Oklahoma City Council.

In my opinion under our previous interpretations of the sections of the constitution involved herein, and considering all of the facts contained in the agreement, same should only be declared legal by a vote of the taxpayers as prescribed by the constitution.

I therefore respectfully dissent.