Dear Senator Brown:
This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
 Regarding 62 O.S.Supp. 2008, § 318[62-318], Performance-Based Efficiency Contracts:
 1. May capital cost avoidance be included as an offset in performance contracts if the item(s) being replaced is (are) clearly at "end of life" and can be so documented?
 2. May additional revenue that is directly attributed to the performance contract results be used in the evaluation process?
 3. May stipulated savings be used in evaluating the performance contract expected result if agreed to by the parties and clearly documented as such?
Your questions involve interpretation of 62 O.S.Supp. 2008, § 318[62-318], the statute authorizing Performance-Based Efficiency Contracts ("PBEC"), allowing certain public entities to enter into contracts with qualified providers for acquisition or installation of equipment that will reduce utility consumption or lower operating costs.[1] In effect, the statute allows the lease-purchase of energy-saving equipment or facilities over a 20-year period, subject to certain conditions set out in the statute. *Page 2 
 THE PBEC STATUTE
The PBEC statute provides as follows:
A. For purposes of this section:
 1. "Public entity" means any political subdivision of this state, or a public trust which has as a beneficiary a political subdivision of this state, or any institution of higher education which is part of The Oklahoma State System of Higher Education;
 2. "Performance-based efficiency contract" means a contract for the design, development, financing, installation and service of any improvement, repair, alteration or betterment of any building or facility owned, operated or planned by a public entity; or any equipment, fixture or furnishing to be added to or used in any such building or facility; or any maintenance or operational strategy that is designed and implemented that will reduce utility consumption or lower operating costs, and may include, but is not limited to, one or more of the following:
 a. utility services,
 b. heating, ventilating or air conditioning system modifications or replacements and automated control systems,
 c. replacement or modifications of lighting fixtures,
 d. indoor air quality improvements to increase air quality that conform to the applicable state or local building code requirements when done in conjunction with other cost-saving measures,
 e. any additional building infrastructure improvement, cost saving, life safety or any other improvement that provides long-term operating cost reductions and is in compliance with state and local codes, or
 f. any facility operation and support programs that reduce operating cost; and
 3. "Qualified provider" means a person or business experienced or trained in the design, analysis and installation of energy conservation and facility management measures. A qualified provider must employ *Page 3 
a professional engineer registered in the State of Oklahoma.
 B. In addition to any other legally permissible alternatives of entering into contracts, any public entity may enter into performance-based efficiency contracts with a qualified provider pursuant to the provisions of this section. Further, any public entity may enter into an installment contract, lease purchase agreement or other contractual obligation for the purpose of financing performance-based efficiency projects for a term not to exceed twenty (20) years or the useful life of the project. A qualified provider to whom the contract is awarded shall be required to give a sufficient bond to the public entity for its faithful performance of the contract. In addition, the public entity may require performance bonds covering the annual amount of guaranteed savings over the contract term.
 The contract's cost savings to the public entity must be guaranteed each year
during the term of the agreement. The savings must be sufficient to offset the annual costs of the contract. The contract shall provide for reimbursement to the public entity annually for any shortfall of guaranteed savings. Savings must be measured, verified and documented during each year of the term and may be utilized to meet the annual debt service. This section shall constitute the sole authority necessary to enter into performance-based efficiency contracts, without regard to compliance with other laws which may specify additional procedural requirements for execution of contracts.
62 O.S.Supp. 2008, § 318[62-318] (emphasis added).
 ANALYSIS
The PBEC statute was first enacted in 2001 (see 2001 Okla. Sess. Laws ch. 436, § 1) with amendments in 2004 relating to performance bonds. See
2004 Okla. Sess. Laws ch. 299, § 2. While subsections (A)(2)(a) through (d) of Section 318 relate primarily to design, installation and service of physical equipment, e.g., various utilities, HVAC systems, lighting, etc., subsection (e) includes "any additional building infrastructure improvement, cost saving, life safety or any other improvement that provides long-term operating costreductions and is in compliance with state and local codes," and subsection (f) includes "any facility operation and support programs that reduce operating cost[.]"Id. (emphasis added). There are no reported Oklahoma cases that construe or discuss the PBEC statute.
"The primary goal of rules of statutory construing is to ascertain [and give effect to] the legislature's intent," and "[s]uch intent must be gleaned from the statute in view of its general purpose and object." DeLaughter v. State ex rel. Okla. Dep't of MentalHealth Substance Abuse Serv.,47 P.3d 462, 464 (Okla. 2001) (citations omitted). The terms "operating cost," "cost reductions," and "cost savings" are not defined in the statute.? However, the word "will" appears to be mandatory.? See Russell v. Harrison,124 P. 762, 763 (Okla. 1912). Therefore, we must look to the generally *Page 4 
accepted, plain and ordinary meanings of the words to interpret the statute. See Income Tax Protest of Ashland Exploration,Inc. v. State ex rel. Okla. Tax Comm'n,751 P.2d 1070, 1073 (Okla. 1988).
The word "cost" means "the amount asked or paid for a thing," or "the amount spent in producing a commodity." WEBSTER'S NEW WORLD DICTIONARY 171-72 (2d ed. 1979). "Saving" means "any reduction in expense, time, etc." Id. at 664. "Reduce" means "to lessen in any way, as in size, amount, value, price, etc," (id. at 626) and "operating" means to "to be in action; work."Id. at 525. "Utility" means "something useful to the public, esp. the service of electricity, gas, water, etc."Id. at 825. Analyzed using these terms, we conclude the language of the statute is plain and unambiguous.
We conclude the purpose of the statute, taken as a whole, is to authorize certain public entities to enter into contracts with qualified providers for improvements or maintenance or operating strategies with respect to their buildings or facilities that will reduce utility consumption or result in a reduced expenditure for obtaining one or more utilities, paying for the improvements over time through savings in annual costs. Such savings in costs must be annually guaranteed by the provider, and a bond must be furnished by the provider to assure proper performance of the contract.
For example, if a school district proposes to enter into a PBEC with a qualified provider for a heat, ventilation and air conditioning ("HVAC") system, savings from installation of the system must be sufficient to offset the annual costs of the contract. If the annual cost of providing and installing more energy-efficient equipment is $100,000, the annual reduction in utility or other costs to the school district must be at least $100,000. The contract's cost savings must be guaranteed, with the provider furnishing performance bonds.
Generally, unless a public entity is specifically authorized by statute to do a particular thing, that activity may not be undertaken unless it can reasonably be implied from the statute. A public agency or entity created by Constitution or statute "may only exercise the powers granted by statute and cannot expand those powers by its own authority." Marley v. Cannon,618 P.2d 401, 405 (Okla. 1980); see alsoShipp v. Se. Okla. Indus. Auth.,498 P.2d 1395, 1398 (Okla. 1972); Morris v. City of Okla.City, 299 P.2d 131, 142 (Okla. 1956) (Blackbird, J., dissenting). Further, while a public agency such as a municipality has general powers to enter into contracts, (see, e.g., 11 O.S. 2001, § 22-101[11-22-101](4)), the statute at issue here deals with a narrow, specific situation, and we conclude the principle of statutory construction applies that a special statute will control over a statute of general applicability.See Humphries v. Lewis, 67 P.3d 333,336
n. 4 (Okla. 2003) (citation omitted). Thus, in entering into PBEC contracts, public agencies are constrained by the terms of the statute authorizing such activities. *Page 5 
Your questions are accordingly analyzed and answered as follows:
1. May capital cost avoidance be included as an offset inperformance contracts if the item(s) being replaced is (are)clearly at "end of life" and can be so documented?
The introductory paragraph of Section 318(A)(2) includes the phrase "any maintenance or operational strategy that is designed and implemented that will reduce utility consumption or loweroperating costs" as being a necessary component of a PBEC.?Id.? (emphasis added). The reduction of utility consumption or operating costs is an essential feature of a PBEC.?
Capital costs, and utility or operating costs, are two entirely different things. "Capital cost" refers to the cost of acquiring capital items, i.e., fixed assets or tangible items expected to last many years and which, if in private hands, would be subject to depreciation under federal income tax laws.See 70 O.S.Supp. 2009, § 1-117[70-1-117](C); see also St. Louis-SanFrancisco Ry. Co. v. McCurtain County Okla. Excise Bd.,352 P.2d 896, 899 (Okla. 1960). The term "capital cost" or "capital outlay" does not appear anywhere in the PBEC statute. While a PBEC contract may involve acquisition of capital items, it is in the context of saving utility costs. For example, the acquisition of a more energy-efficient air conditioning unit may, or may not, be involved in a performance-based efficiency contract. It may be that with better building insulation or improved operating or maintenance practices, utility costs may be lowered. That, in our opinion, is the purpose of a PBEC — to result in saving operating and/or utility costs, not necessarily capital costs.
Nothing in the PBEC statute indicates that capital cost or "capital cost avoidance" is to be taken into account in evaluating a PBEC — to the contrary, the stated purpose of a PBEC arrangement is to realize "long-term operating cost reductions" to the public entity, not reduce the cost of capital items. There is no mention of using "avoided capital costs" as an offset to the cost of a PBEC. Thus we conclude, as a matter of law, theavoidance of a capital cost may not be included as an offset in a performance-based efficiency contract. It matters not if a school district's air conditioner is at the end of its useful life and will soon have to be replaced; the question in a PBEC is whether the agreement will result in annual operating cost savings, which will be guaranteed by the provider. The authority for a public entity to consider "avoided capital costs" in approving a PBEC is not included in the statute, and accordingly, the public entity lacks such a power. Shipp, 498 P.2d at 1398.
2. Can additional revenue that is directly attributed to thePerformance Contract results be used in the evaluation process?
Nothing in the PBEC statute authorizes the governing body of a public entity to take into consideration any additional revenue that may be gained as a result of installation of energy-saving facilities or equipment. If a school district, for example, through a PBEC, installs energy saving equipment or makes building changes that result in lowered operating costs, how will that improvement result in increased revenues? It will not result in increased ad valorem tax revenues or *Page 6 
other sources of income from which the expenses of the school may be paid, although decreased operating costs may result in the school district realizing higher net revenues (i.e., revenues after expenses) for other purposes. For example, if the temperature in a school gymnasium is kept at the same level for games or other events both before and after the energy-saving changes are made, it is hard to conceive how this will result in higher attendance, thus higher "gate fees" for the school, although it may result in more money left after paying electric bills with which the school can pay other expenses. Rather, the statute contemplates it will be savings, not additional revenues, that will justify such a contract.
We conclude there is nothing in the PBEC statute that authorizes a public entity to take increased revenues into account in evaluating whether or not the entity should enter into a performance-based efficiency contract. The primary reason a PBEC can be used is to reduce operating or utility costs.
3. Can stipulated savings be used in evaluating the performancecontract expected result if agreed to by the parties and clearlydocumented as such?
By its terms, nothing in the PBEC statute authorizes a public entity to agree, by stipulation, to a particular amount of savings expected to result from implementation of a contract under the PBEC statute. In any event, by so doing, the parties could only express their respective expectations as to the contract's effect, and this does not relieve the provider of the obligation to guarantee annual energy cost savings. There is no way the public entity can know, in advance, what utility savings may occur. That is something the provider under a PBEC must guarantee.
The plain language of the PBEC statute requires that:
 The contract's cost savings to the public entity must be guaranteed each year during the term of the agreement. The savings must be sufficient to offset the annual costs of the contract. The contract shall provide for reimbursement to the public entity annually for any shortfall of guaranteed savings. Savings must be measured, verified and documented during each year of the term and may be utilized to meet the annual debt service.
62 O.S.Supp. 2008, § 318[62-318](B) (emphasis added). Regardless of what recitations the parties may make as to expectations of results, the provider of the goods or services must comply with the provisions of the PBEC statute requiring such guarantees, andmust post a sufficient bond with the public entity to assure faithful performance of the contract. Id. The plain requirements of the statute cannot be overridden by a stipulation between the parties.
 It is, therefore, the official Opinion of the Attorney General that:
 1. Title 62 O.S.Supp. 2008, § 318[62-318] requires that improvements or a plan of operation under a Performance-Based Efficiency Contract ("PBEC") *Page 7 must result in utility or operating cost savings to the public entity each year, and such cost savings must be guaranteed each year during the term of the agreement. The savings must be sufficient to offset the annual costs of the contract. The contract shall provide for reimbursement to the public entity annually for any shortfall of guaranteed savings. Id.
 2. Capital cost avoidance may not be considered by the governing body of a public entity in determining whether a PBEC should be approved. The authority for a public entity to enter into a PBEC is governed by the statute, and such authority is limited by its terms. Absent statutory authorization, the power does not exist. Id.; Shipp v. Se. Okla. Indus. Auth., 498 P.2d 1395, 1398 (Okla. 1972) Marley v. Cannon, 618 P.2d 401, 405 (Okla. 1980).
 3. Likewise, generation of additional revenue attributed to a facility improved under a PBEC is not authorized by 62 O.S.Supp. 2008, § 318[62-318], and may not be considered by a public entity in approving such a contract.
 4. Expected savings stipulated to or by the parties are irrelevant to the validity of a performance contract under 62 O.S.Supp. 2008, § 318[62-318]. Such a contract must provide for annual operating cost savings which are guaranteed each year by the provider, which must also post a sufficient bond with the public entity to assure the faithful performance of the contract. Id.
W.A. DREW EDMONDSON Attorney General of Oklahoma
LYNN C. ROGERS Assistant Attorney General
L-52
[1] A generally similar provision for state agencies appears at 61 O.S.Supp. 2008, § 212[61-212]; however, this Opinion does not analyze this statute. *Page 1