**MARATHON OIL COMPANY, Appellant,**

v.

**CORPORATION COMMISSION OF the STATE OF OKLAHOMA and Arco Oil and Gas Company, Appellees.**

**ANADARKO PETROLEUM CORPORATION, and Marathon Oil Company, Appellants,**

v.

**CORPORATION COMMISSION OF the STATE OF OKLAHOMA and Arco Oil and Gas Company, Appellees.**

Nos. 77190, 76955.

Supreme Court of Oklahoma.

March 1, 1994.

Rehearing Denied Feb. 15, 1996.

Andrews Davis Legg Bixler Milsten & Price by S. Paul Hammons, Oklahoma City, for appellant Marathon Oil Co.

Watson & McKenzie by H.B. Watson, Jr., Sharon Taylor Thomas, Janis W. Preslar, Oklahoma City, for appellee Arco Oil and Gas Co.

Lindil C. Fowler, Jr. and Leslie W. Pepper, and Ben Jackson, Gen. Counsel Oklahoma Corp. Com'n, Oklahoma City, for appellee Oklahoma Corp. Com'n.

Mahaffey & Gore by Richard J. Gore, Oklahoma City, for appellees J. Howard Lennon and C. Everett Lennon.

Stack & Barnes by Robert N. Barnes, Deborah B. Barnes, Oklahoma City, for appellee Nicor Exploration Co.

HODGES, Chief Justice.

Anadarko Petroleum Corporation (Anadarko) and Marathon Oil Company (Marathon), appellants, appeal from two orders issued by the Oklahoma Corporation Commission (OCC) establishing field rules for the Wilburton–Arbuckle gas field located in Latimer County, Oklahoma. Arco Oil and Gas Company (ARCO), NICOR Exploration Company (NICOR), J. Howard and C. Everett Lennon, and the OCC are the appellees. Order number 352615 found that the OCC had jurisdiction over the matter. Order number 353858 established the field rules. The issues in this appeal are (1) whether the OCC had jurisdiction to establish field rules, (2) whether the orders are void for failure to give notice to owners of mineral interests whose interests are not included in the common source of supply as defined by the spacing order, and (3) whether the OCC's orders were supported by substantial evidence.

ARCO filed an application with the OCC to classify the Wilburton–Arbuckle common source of supply, which is the subject of this dispute, as a special allocated gas pool and to establish field rules setting production rates for the spacing units. There are fifteen producing wells in the field as established by the OCC's spacing order. Fourteen of those are operated by ARCO. Marathon has a working interest in five of the eighteen spacing units.

Marathon filed a motion to dismiss. The motion was presented to an administrative law judge and an appellate administrative law judge. Both administrative law judges found that the OCC lacked jurisdiction to issue field rules. On December 14, 1990, Marathon filed an Application to Assume Original Jurisdiction and Petition for Writ of Prohibition which this Court declined. On January 31, 1991, the OCC entered its order enacting field rules.

It is uncontested that the field is defined by bounding faults and is highly fractured. Because of the fractures the field is both horizontally and vertically permeable causing the wells to be in communication with each other. It is further uncontested that it is impossible to construct an accurate net isopach map[1] because the porosity across the field is highly variable. The parties agree that the gas-water transition zone is at 13,300 feet below sea level. The relationship of porosity to the quantity of gas in place is of utmost importance to the understanding of the issues in this matter. Porosity of rock is "[t]he relative volume of the pore spaces between mineral grains as compared to the total rock volume. This porosity measures the capacity of the rock to hold oil, gas, and water."[2] Therefore, the higher the porosity, the more gas is in place.

ARCO's experts testified that, because porosity cannot be accurately calculated, it should be assumed that the porosity can be expected to be uniform across the field, both horizontally and vertically. Based on this assumption, ARCO further assumed that the gas underlying each unit was equal to the "gross rock" volume underlying each unit. The parties have used the term gross rock to denote the space underlying each unit. There was no evidence presented on which to base this assumption, and no one testified that gross rock was a measure of gas in place.

1. An isopach map is a " 'map which represents the thickness of a formation by means of lines, similar to contour lines, drawn through points of equal thickness.' " Howard R. Williams & Charles J. Meyers, *Oil and Gas Terms* 484 (1987).

2. *Id.* at 730.

ARCO proposed field rules based on these two assumptions. ARCO calculated what it determined to be the area of the reservoir. Gross rock was determined by multiplying the area underlying each unit times the height of the Arbuckle formation underlying each unit. ARCO used 13,300 feet below sea level as the base of the Arbuckle in determining the height of the formation under each unit. ARCO totaled the gross rock from each unit to arrived at the total gross rock for the field. It then determined what portion of gross rock underlaid each unit. ARCO proposed that each unit be assigned an allowable based solely on the portion of gross rock under each unit.

Based on its calculations of the gross rock under each unit, ARCO determined that some of the wells were not recovering their fair share of the gas and that correlative rights were being violated. ARCO reasoned that, in order to protect correlative rights, either field rules would have to be adopted or additional wells would have to be drilled. It argued that the drilling of additional wells would constitute waste.

Marathon presented evidence that most of the porosity was above 716 feet below the ceiling of the reservoir and that only a small measure lay between the 716 feet mark and the 13,300 feet below sea level. Based on what Marathon determined to be the gross rock, it proposed a formula ninety per cent of which was based on deliverability and ten per cent on gross rock.

The OCC issued an order for field rules. The OCC found that it had jurisdiction to issue field rules and that proper notice had been given. The OCC also found: "It [was] not possible to correlate the porosity and permeability across the field" and "[t]he best porosity [was] in the upper portion of the reservoir."

Even though the OCC found that the best porosity was in the upper portion of the reservoir, it adopted ARCO's calculation of the gross rock which assumed that porosity was uniform across the field. But the OCC did not adopt ARCO's proposed formula. Rather, the OCC adopted a formula based on fifty per cent deliverability and fifty per cent gross rock.[3]

The field rules provide that the operators will recommend the anticipated deliverability of each well and the anticipated market demand. The pool allowable is equal to the estimated market demand. Each unit's allowable is determined by multiplying the pool allowable times the portion of the unit's gross rock and its wells' deliverability. The deliverability is determined by conducting a five-day test on each well four times a year. The unit allowable shall not be less than twenty per cent of that unit's allowable for the preceding January or 1,000 million cubic feet of gas per day, whichever is greater.

## I. Jurisdiction

 Under its police power, the state has authority to regulate the production of oil and gas. *Helmerich & Payne, Inc. v. Corporation Comm'n*, 532 P.2d 419, 422 (Okla. 1975). The OCC's power, although derived from the police power of the state, is only such as expressly or by necessary implication granted by statute. *Kingwood Oil Co. v. Hall–Jones Oil Corp.*, 396 P.2d 510, 513 (Okla.1964); *Helmerich & Payne*, 532 P.2d at 423. Thus, the police power will not suffice to bestow jurisdiction on the OCC. Neither do we agree that the OCC's jurisdiction is based on an amorphous intent of the legislature which is not specifically addressed by a statute. Rather, there must be statutory authority, either express or necessarily im-

3. The OCC's order provides in section (C)(1):
 Each Spacing Unit, except as herein provided, producing gas from the Arbuckle common source of supply shall have allocated to it each month as its ratable portion of the Pool Allowable that portion of the Pool Allowable as calculated by the following formula:
Step 1—[.50 $(Q_j/\sum Q_j)$ + [.50 $(Ah_j/\sum Ah_j)$ ] ] = $X_j$
Step 2—(PA) $X_j$ = Current Unit Allowable
Where:

| | | |
|---|---|---|
| $Q_j$ | = | Individual Unit Deliverability Factor |
| $\sum Q_j$ | = | Summation of all Individual Unit Deliverability Factors |
| $Ah_j$ | = | Unit Ah Factor |
| $\sum Ah_j$ | = | Summation of all Unit Ah Factors |
| $X_j$ | = | Current Unit Allocation Factor |
| PA | = | Pool Allowable |

Ah represents gross rock which is defined as the volume of productive Arbuckle under a spacing unit.

plied, for the OCC's action. *See Kingwood Oil Co.*, 396 P.2d at 513.

■ The appellees suggest section 86.4 of title 52 expressly grants the OCC's jurisdiction over this matter. Section 86.4 provides:

> The [Oklahoma Corporation] Commission is hereby empowered after notice of hearing to make such orders, rules and regulations applicable to each common source of supply as it may find to be necessary or proper. . . .

The jurisdiction granted under section 86.4 is limited to the protection of public rights. *Nilsen v. Ports of Call Oil Co.*, 711 P.2d 98 (Okla.1985). This protection of public rights includes the prevention of waste and the protection of correlative rights of owners of mineral interests in the land overlying a common source of supply. *Wood Oil Co. v. Corporation Comm'n*, 268 P.2d 878 (Okla.1954). Therefore section 86.4 grants authority to make orders which are necessary to prevent waste as defined in and limited by sections 86.3 and 243 and to protect the correlative rights of the mineral interest owners.[4]

Because we find that section 86.4 empowers the OCC to establish field rules for the protection of correlative rights, we need not address whether the other statutes proposed by the appellees would serve as a basis for jurisdiction.

## II. Notice

■ Marathon objects to the OCC orders based on lack of notice to parties whose interests were not included in the spacing orders. The appellees respond that Marathon does not have standing to object to other mineral owners' lack of notice when

Marathon admittedly received proper notice. The appellees also argue that Marathon has launched an improper collateral attack on the OCC spacing order.

In Order No. 352619, the OCC found that the Arbuckle formation underlying the eighteen sections covered by the application in this case to be a common source of supply. That determination can be changed only upon "a changed factual situation from that existing at the time the order was entered, in order that the modification not constitute a prohibited collateral attack." *Corporation Comm'n, v. Union Oil Co.*, 591 P.2d 711, 716 (Okla.1979). Thus, for purposes of notice, the OCC was authorized to rely on its previous finding and treat the area underlying the eighteen sections as the common source of supply. *Id.* at 717. Because there is no contention that all the owners in those eighteen sections were not given proper notice, the OCC's order is not defective for failure to give proper notice.

## III. Substantial Evidence to Support OCC's Order

■ The standard of review is "whether the findings and conclusions of the Commission are sustained by the law and substantial evidence." Okla. Const. art 9, § 20; *Forest Oil Corp. v. Corporation Comm'n*, 807 P.2d 774, 788 (Okla.1990); *El Paso Natural Gas Co. v. Corporation Comm'n*, 640 P.2d 1336, 1338 (Okla.1981). The substantial evidence test requires consideration not only of the evidence supporting the decision but also of the evidence which diminishes its weight. *Forest Oil Corp.*, 807 P.2d at 788; *El Paso Natural Gas Co.*, 640 P.2d at 1338.[5]

---

4. Section 86.3 provides:

In order to prevent the waste or to reduce the dissipation of gas energy contained in a common source of supply, in addition to its other powers in respect thereof, the Commission shall have the authority to limit the production of gas from well producing gas *only* to a percentage of the capacity of such wells to produce. . . .

Section 239 authorizes the OCC to issue field rules to prevent waste when the supply exceeds the market demand. *See Conoco, Inc. v. Corporation Comm'n*, 764 P.2d 516, 520 (Okla.1988). Effective April 1, 1992, the Oklahoma Legislature amended section 239. The legislature deleted

the language requiring supply to exceed the market demand before the OCC has authority to implement field rules pursuant to that section. 1992 Okla.Sess.Laws ch. 14, § 4.

5. Marathon primarily relies on the administrative law judge's findings that "it is impossible to accurately predict the geology and therefore propensity for production from this zone [and] to predict how much gas exists underneath each of the individual units." Marathon's reliance on the administrative law judge's findings is misplaced.

The OCC is authorized to appoint a hearing officer to take evidence and make a recommen-

■ ARCO's position and the OCC's order assume that the gross rock under each unit was equal to the gas in place. However, there was no testimony to support this assumption. In fact, the testimony was that there was more gas in place in the upper portion of the formation than the lower portion.

ARCO's expert testified to the porosity of the rock in the Arbuckle formation. Jeff Schwarz, a petroleum engineer employed by ARCO, testified the porosity was so highly variable that it could not accurately be mapped across the field. He also testified that the field was highly variable and that ARCO could not map the amount of gas in place in each individual unit. He stated: "Well, you can make some measurements [of gas in place] but I don't think they would be very accurate."

Robert Spaeth, a well log analyst for ARCO, testified that there was more porosity in the upper levels than the lower levels. Also, William Belfield, a geologist for ARCO, testified that the porosity below 716 feet was poor.

Richard Newville, a consulting petroleum engineer and geologist and expert witness for the Lennons, supporters of ARCO's theory, testified that there was no correlation between the porosity reflected in the well logs and ARCO's theory.

John Imel, a petroleum reservoir engineer for Anadarko, testified that ninety-five per cent of the gas recovered from the Kilpatrick well would be recovered from the space above the 716 foot mark. However, ARCO's proposed rules would allow the same amount of gas per cubic foot for the area below the 716 foot mark as above.

Randy Bruner, a petroleum geologist testifying for Marathon, stated that the porosity in the field was not uniform. He believed porosity to be higher in some areas than in others. He opined that on the average the field did not have the same porosity. He stated that there was not enough data to determine the gas in place.

Tammy Webb, a petroleum engineer for Marathon, testified that, in her opinion, the majority of the porosity was in the upper 200 to 300 feet of the formation. She testified that volumetric equations used to determine gas in place considered not only acreage and height but also porosity, gas saturation, and pressure.

There was no testimony that the porosity across the field was uniform. To the contrary, the testimony was that the uniformity could not be determined and that the lower portion of the reservoir had lower porosity than the upper portion.

The OCC apparently believed this expert testimony that porosity was not uniform across the field and was better in the upper portion of the reservoir. In the field rules, the OCC states:

> It is not possible to correlate the porosity and permeability across the field because of the nature of the Arbuckle Formation which is a dolomite in excess of 2,000 feet thick and contains no clearly defined lithologic breaks as are commonly found in sands and shales. *The best porosity is in the upper portion of the reservoir....*

(Emphasis added.)

By the OCC's own admission, it is unable to determine the porosity across the field. Further, the OCC concluded that the porosity in the upper portion of the field was better than in the lower portion—a direct contradiction to the assumption on which the field rules are based, that the porosity across the field is uniform. Even though the testimony and the OCC's findings recognized that the upper portion of the field had a higher porosity than the lower portion, the OCC treated the upper portion and the lower portion as containing the same amount of gas per cubic foot. Therefore, the OCC's field rules are based on erroneous assumptions which are not supported by substantial evidence.

The OCC had jurisdiction to establish field rules in this matter. However, the field

dation. Okla.Stat. tit. 52, § 149.1 (Supp.1982). However, the findings and recommendations of the hearing officer are not entitled to any special weight in this Court. *See Cameron v. Corporation*

*Comm'n,* 414 P.2d 266, 272 (Okla.1966); *see also Van Horn Oil Co. v. Oklahoma Corp. Comm'n,* 753 P.2d 1359, 1363 (Okla.1988).

rules adopted by the OCC were based on the incorrect assumption that the porosity across the field both horizontally and vertically was uniform. The OCC should have treated the upper portion of the field differently than the lower portion.

Because the OCC's field rules were not supported by substantial evidence, the matter is remanded for the OCC to establish field rules which reflect the differences in porosity and volume between the upper portion of the field and the lower portion. If the OCC is unable to establish such a formula, then the parties are to be reinstated to the position they would have been in had the field rules not been issued. Therefore, we affirm the OCC's order number 352615 finding that it had jurisdiction, reverse order number 353858 establishing field rules and remand for proceedings consistent with this opinion.

OKLAHOMA CORPORATION COMMISSION ORDER NUMBER 352615 AFFIRMED; ORDER NUMBER 353858 REVERSED; CAUSE REMANDED WITH INSTRUCTIONS.

LAVENDER, V.C.J., and OPALA, ALMA WILSON and WATT, JJ., concur.

SIMMS, J., concurs in result as to Part I; dissent as to Parts II and III.

HARGRAVE, KAUGER and SUMMERS, JJ., concur in part; dissent in part.

SUMMERS, J., with whom HARGRAVE, J., joins, concurring in part; dissenting in part: I would affirm both orders of the Corporation Commission.