2000 OK 2

**TULSA COUNTY DEPUTY SHERIFF'S FRATERNAL ORDER OF POLICE, LODGE NUMBER 188, Myra Kay Eberle, Tommy M. Fike, Laura Mcintire, Russell Frank Porter, John Edward Schonholtz and Debbie Ann Walters, Plaintiffs/Appellants,**

v.

**BOARD OF COUNTY COMMISSIONERS OF TULSA COUNTY and Tulsa County Criminal Justice Authority, Defendants/Appellees.**

**Stanley Glanz, Sheriff of Tulsa County, Plaintiffs/Appellant,**

v.

**Board of County Commissioners of Tulsa County, and Tulsa County Criminal Justice Authority, Defendants/Appellees,**

and

**Oklahoma Sheriffs' Association, Intervenor/Plaintiff/Appellant,**

v.

**Board of County Commissioners of Tulsa County, and Tulsa County Criminal Justice Authority, Defendants/Appellants.**

**Nos. 92,626, 93,503.**

Supreme Court of Oklahoma.

Jan. 14, 2000.

Rehearing Denied Feb. 24, 2000.

---

James Thomas, Tulsa, Oklahoma; Thomas D. Frasier, Steven Hickman, Frasier, Frasier & Hickman, Tulsa, Oklahoma; Michael H. Thompson, Oklahoma City, Oklahoma, For Appellants, Tulsa County Deputy Sheriff's Fraternal Order of Police, Lodge Number 188, Myra Kay Eberle, Tommy M. Fike, Laura Mcintire, Russell Frank Porter, John Edward Schonholtz and Debbie Ann Walters,

Frederick S. Esser, Shelley Clemens, Washington County District Attorney, Bartlesville, Oklahoma, For Appellant, Stanley Glanz, Sheriff of Tulsa County.

Reuben Davis, Mary L. Lohrke, Boone, Smith, Davis, Hurst & Dickman, Tulsa, Oklahoma, For Appellant, Oklahoma Sheriff's Association.

C.S. Lewis, III, Gretchen M. Schilling, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, Oklahoma, For Appellees, Tulsa County Criminal Justice Authority.

Tim Harris, Dick A. Blakeley, Office of the Tulsa County District Attorney, Tulsa, Oklahoma, For Appellees, Board of County Commissioners of Tulsa County.

HODGES, J.

## I. ISSUES

¶ 1 Three issues are presented for this Court's review: (1) whether title 19, section 744 and title 57, section 41, the statutes allowing jail-privatization, are constitutional-

ly infirm;[1] (2) if the statutory provisions are constitutional, whether the Tulsa County Criminal Justice Authority (TCCJA) exceeded its authority by contracting with a private company for the operation and maintenance of the new Tulsa County Jail; and (3) whether the office and duties of sheriff were properly altered by the Legislature. We conclude that the challenged provisions are valid, that the TCCJA did not exceed its power by entering into a contract with a private company for the operation of the Tulsa County Jail, and that the Legislature had authority to and did in fact alter the duties of sheriff.

## II. FACTS

¶ 2 When the United States Justice Department investigated the Tulsa County jail system in 1994, it found that the condition of the jail violated the constitutional rights of prisoners and detainees. As part of a settlement agreement, Tulsa County agreed to build a new county jail by November 1998, to be occupied by February 1999.

¶ 3 On September 12, 1995, Tulsa County voters approved a sales tax increase for the construction and operation of a new county jail. The Tulsa County Commissioners created a public trust, the TCCJA, to administer the proceeds of the sales tax increase and the construction and operation of the new jail.

On July 24, 1998, the TCCJA contracted with Corrections Corporation of America (CCA) for the management and operation of the new county jail.

¶ 4 The Tulsa County Sheriff's Fraternal Order of Police, Lodge Number 188 and a group of taxpayers sought a declaration that the TCCJA had wrongly been formed under title 60, rather than title 19, and that the delegation of jail operations to a private entity was unconstitutional. On cross motions for summary judgment, the trial court found that the TCCJA had not been properly created and that the delegation issue was therefore moot. An appeal was taken from this judgment. In the first appeal in this case, this Court reversed the trial court, holding that the TCCJA had been properly formed under the general trust provisions of title 60, section 176.[2] Because the trial court had not addressed the delegation issue, we remanded the case for further proceedings.[3]

¶ 5 On remand, the trial court, concluding that the jail-privatization statutes were valid, denied plaintiffs' motion for summary judgment and granted the County's cross motion for summary judgment. Once again, an appeal was taken (Appeal No. 92,626), this time by the plaintiffs. In a separate case, Stanley Glanz, Sheriff of Tulsa County, brought suit against the same defendants, and the Oklahoma Sheriffs' Association intervened. The

---

1. Section 744 of title 19 provides:

A. Each board of county commissioners is hereby authorized to enter into contracts with private contractors for the management and operation of any jail owned by the county or for the incarceration of inmates in jail facilities owned and operated by private contractors. Such services shall meet any standards prescribed and established for county jails, including but not limited to standards concerning internal and perimeter security, discipline of inmates, employment of inmates, and proper food, clothing, housing, and medical care. Said contracts shall be entered into for a period not to exceed fifty (50) years subject to annual appropriations by the county excise board. Said contracts shall be valid for a fiscal year only if the county excise board provides an appropriation for the contract for that fiscal year.

Title 57, section 41 provides:

Every county, by authority of the board of county commissioners and at the expense of the county, shall have a jail or access to a jail in another county for the safekeeping of prisoners lawfully committed.

A county may enter into contracts with private prison contractors to provide and operate jail facilities for the county.

2. *Tulsa County Deputy Sheriff's Fraternal Order of Police, Lodge Number 188 v. Bd. of County Comm'ns,* 1998 OK 44, ¶ 17, 959 P.2d 979, 982. In the first appeal, plaintiffs argued that the TCCJA was invalid because it was created pursuant to the provision of title 60 of the Oklahoma Statutes rather than those of title 19, specifically section 904.1. Section 904.1 explicitly authorizes the creation of county jail trust authorities. This Court concluded that the TCCJA had been properly created because the provisions of title 19 are not exclusive. *Id.* at ¶ 15. This Court stated that "Tulsa County and its cities were not limited to a single method of providing jail functions. On the contrary, they are free to utilize any applicable method provided by the Legislature, including the creation of a public trust under title 60, section 176." *Id.* at ¶ 16.

3. *Id.* at ¶ 18.

issues in both cases were the same. The trial court in the second case (Appeal No. 93,503) denied plaintiff's motion for summary judgment and granted the defendant's cross motions for summary judgment. The issues preserved for this Court's review are the same in both appeals. This Court retained both of the appeals for review of the presented issues. This Court, *sua sponte*, raised the issue of the effect of article 5, section 46 of the Oklahoma Constitution on jail privatization statutes, ordered the parties to submit briefs addressing this issue, and heard oral arguments on the issue.

### III. STANDARD OF REVIEW

¶ 6 In the present appeals, the plaintiffs have challenged the constitutionality of section 744 of title 19 and of section 41 of title 57, both of which authorize counties to enter into contracts with private entities for the operation of county prison facilities. Where the constitutionality of a legislative act is challenged, there is a presumption in favor of its validity, and this Court is not at liberty to evaluate the desirability or wisdom of the act.[4] The challenging party must show "beyond a reasonable doubt" that the act is unconstitutional.[5] "Whenever possible, statutes should be construed so as to uphold their constitutionality."[6]

### IV. DELEGATION AND ADEQUATE STANDARDS

¶ 7 The plaintiffs argue that the Legislature has improperly delegated its rule-making authority by allowing the county to establish procedures for jail operation. This Court has not previously addressed the issue of whether the statutory provisions allowing counties to privatize their jails is an unlawful delegation of legislative power.

¶ 8 Oklahoma's non-delegation doctrine is rooted in articles IV and V of the Oklahoma Constitution. Section 1 of article IV provides for the separation of the three branches of government. Section 1 of article V requires that "[t]he Legislative authority of the State shall be vested in a Legislature consisting of a Senate and House of Representatives...." Based on section 1 of article V, it is a well-settled rule that "the legislature must not abdicate its responsibility to resolve fundamental policy making...."[7]

¶ 9 This prohibition does not forbid the Legislature from delegating power to implement its statutorily-mandated policies.[8] Even though the Legislature may not delegate the power to make laws, it can delegate the authority to make rules and regulations in the implementation of statutory enactments.[9] To prevent the Legislature's role from being usurped, its ability to delegate rule-making authority is subject to the condition that the statutory scheme "must establish [the legislative] policies and set out definite standards for the exercise of any agency's rule making power."[10]

> While it is well settled in this jurisdiction that the power to determine the policy of the law is primarily legislative and cannot be delegated, the power to make rules of a subordinate character in order to carry out the policy legislatively determined and to apply that policy to varying factual conditions, although sharing the attributes of legislative exercise of power, is in its major sense an administrative duty which may be delegated properly to an administrative body by the Legislature.[11]

¶ 10 When interpreting statutes, the intent of the Legislature controls, and to

4. *State ex rel. York v. Turpen,* 1984 OK 26, ¶ 7, 681 P.2d 763, 766.

5. *City of Bethany v. Public Employees Relations Bd.,* 1995 OK 99, ¶ 29, 904 P.2d 604, 613.

6. *Reherman v. Water Resources Bd.,* 1984 OK 12, ¶ 11, 679 P.2d 1296, 1300.

7. *City of Oklahoma City v. State ex rel. Dept. of Labor,* 1995 OK 107, ¶ 12, 918 P.2d 26, 29 (quoting *Democratic Party v. Estep,* 1982 OK 106, n. 23, 652 P.2d 271, 277 n. 23 (1982)).

8. *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 654, 102 L.Ed.2d 714 (1989); *Democratic Party v. Estep,* 1982 OK 106, n. 23, 652 P.2d 271, 277 n. 23 (1982).

9. *City of Sand Springs v. Dept. of Pub. Welfare,* 1980 OK 36, ¶ 7, 608 P.2d 1139, 1144; *Isaacs v. Oklahoma City,* 1966 OK 267, ¶ 11, 437 P.2d 229, 233.

10. *Estep,* 1982 OK 106, ¶ 16, 652 P.2d 271, 277.

11. *City of Sand Springs,* 1980 OK 36, ¶ 7, 608 P.2d 1139, 1144.

ascertain the legislative intent, all statutory provisions upon a particular subject will be considered and given effect as a whole.[12] An examination of all relevant statutory provisions is specific of the legislative intent that county jails would be subject to the same standards whether operated by the sheriff or a private entity. Section 744 of title 19 of the Oklahoma Statutes authorizes private operation of county prisons and provides that such jail "services shall meet any standards prescribed and established for county jails, including but not limited to standards concerning internal and perimeter security, discipline of inmates, employment of inmates, and proper food, clothing, housing, and medical care."[13] Also relevant is section 68 of title 57 which states "any state law governing jails shall apply to jail facilities operated by a private prison contractor."[14]

¶ 11 There are extensive guidelines already in place which have long applied to county-operated prisons and, under section 744 of title 19 and section 68 of title 57, apply to privately-operated prisons. Section 192 of title 74 requires certain standards for many areas of jail operations such as: admission and release procedures, security, sanitary conditions, diet, clothing, living space, discipline, prisoners' rights, staff training, safety, prisoner supervision and segregation of females, minors and the infirm. Under section 192 of title 74, the State Health Department is required to inspect county jails once a year and violations are to be reported to the district attorney. The Oklahoma Administrative Code, title 310, section 670, sets out additional standards for jail operations. These standards, under which counties have operated their jails, apply to and are nonetheless sufficient for private-jail operations.

¶ 12 The Legislature has enacted policy addressing how prisons should be operated and allowing privatization. Because the Legislature has provided that all county jails are subject to the same standards whether operated by a county or a private company, it is not necessary for the Legislature to create entirely new standards for privately-operated county jails when adequate standards already exist. The authority to set county-specific rules for the operation of county jails may be delegated because the rules are of subordinate character and necessary to carry out the legislatively-mandated policies. Each county's individualized policies and procedures will differ depending upon the resources and facilities that it has at its disposal. Further, these policies and procedures are subordinate to the myriad of statutes and regulations which govern jails and prisons. When all provisions concerning county jail facilities are viewed as a whole, there are adequate standards for the county to follow in implementing jail procedure.

¶ 13 Plaintiffs rely heavily on *City of Okla. City v. State ex rel. Okla. Dept of Labor*,[15] in which we found Oklahoma's Minimum Wages on Public Works Act[16] to be an unconstitutional delegation of authority. Originally, the Minimum Wage Act required the Labor Commissioner to investigate and determine the prevailing wage.[17] As initially written the Act provided standards for the Commissioner to follow and specified the types of information that the Commissioner was to consider in making a determination of the prevailing wage.[18]

---

**12.** *Indep. Sch. Dist. No. 89 v. Okla. City Fed'n of Teachers, Local 2309*, 1980 OK 89, ¶ 11, 612 P.2d 719, 721.

**13.** Okla. Stat. tit. 19, § 744 (1991).

**14.** Title 57, section 68, provides:
State Law Governs Private Prisons.
A. Except as otherwise provided, any state law governing jails shall apply to jail facilities operated by a private prison contractor.
B. Any offense which would be a crime if committed within a county jail also shall be a crime if committed in a jail facility operated by a private prison contractor.

**15.** *Okla. Dept. of Labor*, 1995 OK 107, 918 P.2d 26.

**16.** Okla. Stat. tit. 40, §§ 196.1–196.14 (1991).
Okla. Stat. tit. 40, §§ 196.1 provides:

It is hereby declared to be the policy of the State of Oklahoma that a wage of no less than the prevailing hourly rate of wages for work of a similar character in the locality in which the work is performed shall be paid to all workmen employed by or on behalf of any public body engaged in public works exclusive of maintenance work.

**17.** Okla. Stat. tit. 40, §§ 196.1, 196.3, 196.6 (Supp.1965).

**18.** *Id.; Okla. Dept. of Labor*, 1995 OK 107, ¶ 13, 918 P.2d at 30.

¶ 14 The Minimum Wage Act, as amended by the Legislature, required the Oklahoma Labor Commissioner to adopt the prevailing wage as determined by the federal Department of Labor. In declaring the amendment unconstitutional, this Court said: "the Act has provided no definite standards or articulated safeguards for the United States Department of Labor to follow in implementing the legislative policy declared in the Act."[19] Therefore, the amended Minimum Wage Act amounted to an unlawful delegation of Legislative authority.

¶ 15 The *Department of Labor* case is distinguishable from the present case. In the *Department of Labor* case, the Legislature did not make any attempt to impose existing standards on the Federal Department of Labor. Instead, the federal agency was given the power to determine the prevailing wage in Oklahoma with no direction from the Oklahoma Legislature. Unlike in *Department of Labor*, here existing standards apply to county jails whether operated by a county or a private company. Counties are ultimately responsible for insuring that their jails meet legislative and administrative standards. The only difference is that the counties now have the option to contract for private operation. In the case of privately-operated county jails, there has been no open ended delegation made as was the case in *Department of Labor*.

**19.** *Okla. Dept. of Labor*, 1995 OK 107, ¶ 14, 918 P.2d at 30.

**20.** The contract between the Authority and CCA provides in pertinent part
Section 5.2 Policies and Procedures: On or before October 1, 1998, the Operator (CCA) shall submit to the Authority (TCCJA), for review and approval, proposed Policies and Procedures which shall specifically describe the manner in which the programs, procedures, and services will be provided by the Operator. The Authority shall review and approve or provide any comments thereon to the Operator within thirty (30) days of its receipt thereof. Thereafter, within thirty (30) days of its receipt of such comments, the Operator shall submit any proposed changes to the Policies and Procedures to the Authority for its review and approval. The Authority shall respond to any such proposed changes within thirty (30) days of its receipt thereof. If a response is not received by the end of the thirty (30) day period, the Operator may deem the policy acceptable.

¶ 16 Plaintiffs argue that CCA is unlawfully being permitted to establish policies and procedures for the new jail. However, the plaintiffs have misstated the facts of the case. The management contract between CCA and the TCCJA states that CCA "shall submit to the Authority (TCCJA), for review and approval, proposed Policies and Procedures."[20] Clearly, CCA has not been permitted to have unfettered discretion in setting policies for the jail's operation. Rather, they are permitted to assist in the drafting of subordinate policies; ultimate control over what policies will be implemented rests with the county. Therefore, the county acting through the TCCJA, not the TCCJA itself, is implementing the legislative policy by approving policies and operating procedures for the new county jail.

## V. DUTIES OF SHERIFF

¶ 17 Plaintiffs also contend that the jail privatization statutes are an unconstitutional delegation of legislative power because they allow counties to alter the duties of sheriff. The Office of Sheriff is constitutionally created "subject to change by the legislature."[21] The Legislature has previously defined the duties of the sheriff to include "the charge and custody of the jail of his county, and all the prisoners" within the county.[22]

**21.** Okla. Const. art. 17, § 2. Article 17, section 2 provides:

There are hereby created, subject to change by the Legislature, in and for each organized county of this State, the offices of Judge of the County Court, County Attorney, Clerk of the District Court, County Clerk, Sheriff, County Treasurer, Register of Deeds, County Surveyor, Superintendent of Public Instruction, three County Commissioners, and such municipal township officers as are now provided for under the laws of the Territory of Oklahoma, except as in this Constitution otherwise provided.

**22.** Okla. Stat. tit. 19, § 513 (1991). Section 513 provides:

The sheriff shall have the charge and custody of the jail of his county, and all the prisoners in the same, and shall keep such jail himself, or by his deputy or jailer, for whose acts he and his sureties shall be liable.

¶ 18 The language of article 17, section 2 specifically gives the Legislature the exclusive power to change the duties of the Office of Sheriff. Not only does the Legislature have the power to alter the duties of the Office of Sheriff, it has the power to abolish the office [23] as it did the offices of County Surveyor [24] and County Superintendent of Public Instruction.[25] In enacting the privatization statutes, the Legislature has demonstrated its intent to change the duties of sheriff. "The primary goal of statutory construction is to ascertain and follow the intention of the Legislature." [26] It is well settled that "intent is ascertained from the whole act in the light of the general purpose and object." [27]

¶ 19 By authorizing the various counties to contract with private entities for the operation of county jails, the Legislature must have foreseen that such action would alter the duties of sheriff. The purpose and object of the challenged provisions is to allow for jail privatization. The Legislature cannot accomplish its object without altering the duties of sheriff. We therefore find that the Legislature's intent was to alter the duties of sheriff and that it has not assigned the power to do so to the counties as argued by the plaintiffs.

## VI. TCCJA'S AUTHORITY TO CONTRACT

¶ 20 Also at issue is whether the TCCJA exceeded its authority as a public trust by entering into a contract with CCA. Title 60 allows public trusts to be established "for the furtherance and accomplishment of any authorized and proper public function or purpose...." [28] It is well settled that "[a] valid trust in property, with a governmental entity as beneficiary, may be created for the furtherance ... of any public function which the governmental entity might be authorized by law to perform." [29]

¶ 21 We have held that a valid public trust could operate a public parking facility, which amounted to the operation of a business for public purposes, even though only the State held the constitutional power to engage in an occupation or business for public purposes.[30] Similarly a valid public trust with a county as beneficiary may exercise rights granted specifically to the county. Since we have already determined that the TCCJA is a valid public trust, the TCCJA may lawfully exercise the powers of its beneficiary in order to accomplish the purpose of the trust.

¶ 22 The plaintiffs argue that the TCCJA, by contracting CCA for the operation of the jail, has exceed its authority under the sales tax proposition which was adopted by a vote of the Tulsa County taxpayers. The TCCJA was created not by the sales tax measure, but by the Tulsa County Commissioners. The TCCJA's authority is thus governed, not by the sales tax measure, but by the authority granted by the Tulsa County Commissioners, part of which was to provide for the operation of the new jail.[31] Thus, the con-

23. Okla. Const. art. 17, § 2.

24. Okla. Stat. tit. 19, § 570 (Supp.1983) ("The office of county surveyor is hereby abolished.").

25. Okla. Stat. tit. 70, § 4–101 (Supp.1993) ("As of July 1, 1993, the office of county superintendent of schools in and for each county in Oklahoma is hereby abolished.").

26. *City of Tulsa v. Public Employees Relations Bd.*, 1998 OK 92, ¶ 14, 967 P.2d 1214, 1220.

27. *City of Bethany*, 1995 OK 99, ¶ 8, 904 P.2d 604, 609.

28. Okla. Stat. tit. 60, § 176(A) (1991). Section 176(A)(2) provides:

Express trusts may be created to issue obligations and to provide funds for the further-

ance and accomplishment of any authorized and proper public function or purpose of the state or of any county or municipality or any and all combinations thereof, in real or personal property, or either or both, or in any estate or interest in either or both, with the state, or any county or municipality or any and all combinations thereof, as the beneficiary [with the] express approval of two-thirds (⅔) of the membership of the governing body of the beneficiary if a county is a beneficiary....

29. *Morris v. City of Oklahoma City*, 1956 OK 202, ¶ 0, 299 P.2d 131, 136.

30. *In re Southern Okla. Dev. Trust*, 1970 OK 118, ¶ 17, 470 P.2d 572, 574.

31. *Tulsa County Deputy Sheriff's Fraternal Order of Police, Lodge Number 188*, 1998 OK 44, ¶¶ 4, 17, 959 P.2d 979.

tract with the CCA was not outside the TCCJA's authority.

## VII. LOCAL OR SPECIAL LAWS

 ¶ 23 Finally we address the impact of article 5, section 46 of the Oklahoma Constitution which provides:

> The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:
>
> . . .
>
> Granting divorces;
>
> Regulating the affairs of counties, cities, towns, wards, or school districts;
>
> . . .
>
> Creating offices, or prescribing the powers and duties of officers in counties, cities, towns, election or school districts. . . . [32]

In their briefs, the appellees and the Sheriff agree that the contested statutes do not offend article 5, section 46 of the Oklahoma Constitution. However, the Fraternal Order of Police and taxpayers, appellants in appeal number 92,626, argue that the statutes, as applied, create an impermissible dichotomy in the duties of sheriff of the different counties. We disagree.

¶ 24 We first note that the jail privatization statutes apply the same to every county. Every county in the state has the option of privatizing its jail system; no counties are deprived of this option. Each county is given authority to determine whether privatization of its county jail is feasible for the particular county.

¶ 25 Even if the privatization statutes create a dichotomy among the counties within the state, they are not constitutionally offensive. In *Sanchez v. Melvin*,[33] this Court upheld a statute creating a dichotomy in the jurisdiction in the Justices of the Peace in Oklahoma and Tulsa counties and the other counties in Oklahoma. It was argued, among

other things, that the statute violated article 5, section 46 of the Oklahoma Constitution.[34] This Court held that for a statute to comply with article 5, sections 46 and 59, it is not necessary that the statute operate universally, but there must be a rational basis for a statutory classification.[35]

¶ 26 More recently, in *Nelson v. Nelson*,[36] this Court addressed the issue of whether requiring divorcing couples with minor children to attend classes on helping children cope offends article 5, section 46 of the Oklahoma Constitution. At footnote 24, this Court emphatically rejected the position that section 46 prohibits all classifications. Specifically, "[a] classification is not a prohibited, special law if it establishes a reasonable classification of persons, entities or things, sharing the same circumstances." [37]

¶ 27 The jail privatization statutes operate equally on all counties in the state. They provide each county the freedom to decide for itself whether privatization of its jails is the most feasible approach for the individual county. The same opportunity is provided all counties. The fact that some smaller counties reject privatization does not diminish the fact that they are given that choice the same as larger counties. For these reasons, we find that the jail privatization statutes do not offend article 5, section 46 of the Oklahoma Constitution.

## IX. CONCLUSION

¶ 28 In conclusion, we note that even though the use of private contractors to operate jails and prisons has recently been renewed, privatization of jails is not a new phenomenon.[38] During the eighteenth century, private contractors were used to operate local jails,[39] and in nineteenth century, private contractors were used extensively to operate prisons.[40]

---

**32.** Article 5, section 59 of the Oklahoma Constitution provides:

> Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted.

**33.** 1966 OK 116, 418 P.2d 639.

**34.** *Id.* at ¶¶ 5–8, 418 P.2d at 640.

**35.** *Id.* at ¶ 14, 418 P.2d at 641.

**36.** 1998 OK 10, 954 P.2d 1219.

**37.** *Id.* 1998 OK 10, ¶ 14 n. 24, 954 P.2d at 1225.

**38.** *Richardson v. McKnight*, 521 U.S. 399, 405, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997).

**39.** *Id.*

**40.** *Id.*

¶ 29 While some federal courts have assumed "the propriety of confinements" in privately owned and operated prisons,[41] at least one federal appellate court has stated: "Nor are we pointed to or can think of any . . . provision of the [United States] Constitution that might be violated by the decision of a state to confine a convicted prisoner in a prison owned by a private firm rather than by a government."[42] A prisoner has no legally protected interest in the identity of his keeper even though there is a legally protected interest in the keeper's conduct.[43]

¶ 30 We conclude that the Legislature has not unlawfully delegated rule-making authority to the counties by allowing them to enter into contracts for private operation of county jails. Operating procedure for county jails is a subordinate matter which may properly be determined by each county. The Legislature has provided adequate standards for jail operations to assist the counties in implementing jail privatization. Under article 17, section 2 of the Oklahoma Constitution, the Legislature had the power to alter the duties of the Office of Sheriff, and it exercised this power when it enacted the legislation allowing jail privatization. Further, the TCCJA, is a valid public trust and did not exceed its authority by entering into a contract with CCA. The privatization statutes are not special or local laws prohibited by article 5, section 46 of the Oklahoma Constitution. Thus, the judgments of both district court cases are affirmed.

TRIAL COURTS' JUDGMENTS AFFIRMED.

¶ 31 SUMMERS, C.J., HARGRAVE, V.C.J., LAVENDER, KAUGER, WATT, JJ.,

SIMMS, Special Judge, (sitting in lieu of BOUDREAU J. who disqualified), HANSEN, Special Judge, (sitting in lieu of the seat left vacant by ALMA WILSON, J.), concur.

¶ 32 OPALA, J. dissents.

OPALA, J., dissenting.

¶ 1 In this consolidated case the court today affirms two summary judgments, holding that (a) the enactments [1] on which the Tulsa County privately-managed jail was rested are free from constitutional infirmities, (b) the Tulsa County Criminal Justice Authority [TCCJA] did not exceed its power by contracting with a private company for the operation of the county jail and (c) there was no legal taint in the legislative alteration of the sheriff's duties. I recede from the court's pronouncement.

¶ 2 The issue here is *not* whether the legislation in contest (or the delegation of jail operations to private entities) is valid, but rather whether the *wholesale transfer of supervision and management of the jail* from the sheriff to another entity—public or private—is constitutionally permissible. I would hold that, *as applied* to Tulsa County, the contract-based operation of the jail offends Art. 5 § 46, Okl. Const.[2] It results in an impermissible dichotomous division of the 77 counties into (a) those in which the local sheriff's range of powers includes the supervision and management of the jail and (b) those in which that authority is transferred to a private jail operator. The transfer of all county control over the jail facility (and the stripping of the sheriff's oversight power) plainly *offends* the symmetry intended by § 46 as well as *creates* an impermissible asymmetry in the authority of sheriffs over the state. Other Oklahoma sheriffs remain vested with statutory power to control the county

---

41. *Id.* at 405, 407, 117 S.Ct. 2100; *Street v. Corrections Corp. of America,* 102 F.3d 810, 814 (6th Cir.1996); *Spencer v. Lee,* 864 F.2d 1376, 1378 (7th Cir.1989).

42. *Pischke v. Litscher,* 178 F.3d 497, 500 (7th Cir.1999).

43. *Id.* at 500.

1. For the legislative enactments in contest here (57 O.S.1991 § 41 and 19 O.S.1991 § 744), which allow the counties to contract with private entities "for the management and operation" of county jails and for the furnishing of jail facilities, see *infra* notes 4 and 5.

2. The *pertinent terms* of Art. 5 § 46, Okl. Const., are:

> The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:
>
> * * * * * *
>
> *Regulating the affairs of counties,* cities, towns, wards or school districts;
>
> * * * * * *
>
> Creating offices, or *prescribing the powers and duties of officers in counties,* cities, town, election or school districts; * * *
>
> (emphasis supplied).

jail operations. 19 O.S.1991 § 513.[3] Because this controversy need not address itself to the facial validity of any statutory text but rather to the *impact of its flawed application* in Tulsa County, I would order the fundamental-law infirmity excised by amending the offending contract clause to provide that the *ultimate oversight control and supervision* of all jail operations—both managerial and correctional—must stand in the sheriff; I would leave the private contractor in charge of the day-to-day operation of the facility. If the court were to adopt my view, the contract would remain in force but all operations of the jail would be subjected to the sheriff's exercise of his statutory power of control.

# I

## THE CONTROVERSY

¶ 3 This is a controversy over the *impact* of the Tulsa County Criminal Justice Authority's [TCCJA's] contract with a private entity to operate and manage the Tulsa County jail. The contract is rested on the provisions of 57 O.S.1991 § 41[4] and 19 O.S.1991 § 744,[5] whose text authorizes each board of county commissioners to enter into an agreement with a private contractor for the operation of county jails. The constitutional validity of this statutory scheme—on which the privately managed Tulsa County jail was founded—came under attack in two separate actions for declaratory and injunctive relief. The *first of these suits* was brought by the Tulsa County Deputy Sheriff's Fraternal Order of Police (and a group of taxpayers) against the Board of County Commissioners [Board] and TCCJA; the *second*—against the same entities—by the Tulsa County Sheriff (and intervenor-Sheriffs' Association).

¶ 4 The plaintiffs [collectively called sheriff] sought judicial declaration of the enactments' invalidity on the ground that they impermissibly delegate the statutory powers and duties of the sheriff's office to a nongovernmental body. At nisi prius summary relief went to the Board (and TCCJA).

¶ 5 On appeal the court directed that the parties[6] assess the negative impact, if any there was, the uniformity mandate of Art. 5 § 46, Okl. Const.,[7] may have upon the validity of the legislative enactments that stand tendered for this court's constitutional testing. Recognizing no fatal *facial deficiency* in the jail "privatization" enactments, the sheriff nonetheless argues that their cumulative effect, *as applied* in Tulsa County, represents an *impermissible regulation* of both *the county affairs* as well as of the *uniform powers conferred by law on county officials*.[8] I accede to this contention.

3. The terms of 19 O.S.1991 § 513 are:
 The *sheriff shall have the charge and custody of the jail of his county*, and all the prisoners in the same, and shall keep such jail himself, or by his deputy or jailer, for whose acts he and his sureties shall be liable.
 (emphasis mine).

4. The terms of 57 O.S.1991 § 41 are:
 Every county, by authority of the board of county commissioners and at the expense of the county, shall have a jail or access to a jail in another county for the safekeeping of prisoners lawfully committed.
 A *county may enter into contracts with private prison contractors* to provide and operate jail facilities for the county.
 (emphasis supplied).

5. The terms of 19 O.S.1991 § 744(A) are:
 A. Each *board of county commissioners is hereby authorized to enter into contracts with private contractors for the management and operation of any jail* owned by the county or for the incarceration of inmates in jail facilities owned and operated by private contractors. Such services shall meet any standards prescribed and established for county jails, including but not limited to standards concerning internal and perimeter security, discipline of inmates, employment of inmates, and proper food, clothing, housing, and medical care. Said contracts shall be entered into for a period not to exceed fifty (50) years subject to annual appropriations by the county excise board. Said contracts shall be valid for a fiscal year only if the county excise board provides an appropriation for the contract for that fiscal year.
 (emphasis supplied).

6. The sheriff and the sheriffs' association (Sup. Ct.No.93,503) and the deputy sheriff's fraternal order of police and taxpayers (Sup.Ct.No.92,626) brought separate appeals from two summary judgments for the Board; the cases were consolidated for disposition by a single opinion.

7. For the terms of Art. 5 § 46, Okl. Const., *see supra* note 2.

8. The 29 October 1999 brief of the Tulsa County Deputy Sheriff's Fraternal Order of Police and taxpayers (pages 6 and 7) argues:
 *Looking at the effect of the jail privatization statutes, as applied in Tulsa County,* an exer-

## II

### THE IMPACT OF ART. 5 § 46, OKL. CONST.,[9] ON THE SCENARIO BEFORE THE COURT

#### A.

*The Search For Constitutional Infirmities To Be Measured By The Standards Prescribed In Art. 5 § 46 And Those To Be Gauged By The Standards Of § 59 Focuses On Vastly Different Criteria*

¶ 6 The court must test the privatization scheme's constitutional orthodoxy by the standards prescribed in Art. 5 § 46 (*not* in § 59). TCCJA's transfer of all *oversight supervision* and *control* of the Tulsa County jail operations from the sheriff to a private prison contractor clearly implicates the interdiction of *local* laws on two subjects that stand included in the § 46 litany of prohibitions. **That section mandates in *absolute terms* statewide uniformity for the ambit of powers and duties of each county officer and for the regulations that affect the government in the counties.**[10] Its relevant terms expressly prohibit the legislature from impacting county affairs by *local* (or *special*)

law.[11] All acts of a county governing body which result in departing from general law affecting the powers and duties of county officers are *per se* offensive to the notion of territorial (statewide) uniformity imposed in absolute terms by § 46.[12]

¶ 7 Conformity to Art. 5 § 59, Okl. Const.,[13] *on the other hand*, presents a problem *entirely unrelated* to the mandate of the § 46 uniformity requirement. Tests used for measuring a law's validity under § 46 [14] are distinct from those for gauging a statute's § 59 orthodoxy. While the former section *prohibits the passage of any special or local law* on a variety of textually identified subjects, the latter merely commands that statutes must have *uniform application through the enactment of general laws.*[15] Within the meaning of § 59 *a special law is nonetheless permissible* whenever a general law could not be made applicable.[16] *Not so under § 46.*

¶ 8 **In sum, a § 46 scrutiny does not concern itself with whether an enactment's subject may be fashioned into a general law.** A prohibited subject may not be disuniformly dealt with by *any* enactment. *Section 46 absolutely invalidates all local or special legislation on prohibited subjects re-*

---

cise in the discretion delegated has had the resulting effect of *regulating the affairs of Tulsa County*. Specifically, the exercise of this privatization option has effectively prescribed powers to new county officers (employees of private for-profit prison operator), and has *regulated the powers, duties and jurisdiction of the Tulsa County Sheriff*, taking him totally outside any policy making function relating to the jail or to the prisoners.
(emphasis supplied).

9. For the terms of Art. 5 § 46, Okl. Const., *see supra* note 2.

10. *Nelson v. Nelson*, 1998 OK 10, 954 P.2d 1219, 1232 (Opala, J., dissenting); *Reynolds v. Porter*, 1988 OK 88, 760 P.2d 816, 822; *State of Oklahoma ex rel. Nesbitt v. District Court of Mayes County*, 1967 OK 228, 440 P.2d 700, 705–706 (*noting that Art. 5 § 46 prohibits special or local laws prescribing the powers and duties of county officers, the court held that nothing in Oklahoma's fundamental law authorizes the legislature to impose upon an arbitrarily selected group of county officials duties which do not stand imposed upon like officials in other counties of the state* ).

11. *Maule v. Independent School Dist. No. 9*, 1985 OK 110, 714 P.2d 198, 203–204; *Reynolds, supra* note 10 at 822; *Great Plains Federal S & L Assn.*

v. *Dabney*, 1993 OK 4, 846 P.2d 1088, 1095–1096 (Opala, J., concurring).

12. *See Nelson, supra* note 10 at 1229 (Opala, J., dissenting)(a countywide or local rule affecting the powers and duties of county officers is *per se* offensive to the § 46 uniformity mandate).

13. The terms of Art. 5, § 59, Okl. Const., are:

Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted.

14. For the terms of Art. 5 § 46, Okl. Const., *see supra* note 2.

15. *Reynolds, supra* note 10 at 822; *Nesbitt, supra* note 10 at 703 syl. 1.

16. When testing a statute's constitutional orthodoxy under § 59, a three-prong inquiry is to be made: (1) Is the statute a special or general law? (2) If the act is a special law, *could a general law be made applicable?* and (3) If a general law may not be made applicable, does the statute pass muster as a permissible special law? *Ross v. Peters*, 1993 OK 8, 846 P.2d 1107, 1119; *Reynolds, supra* note 10 at 822.

*gardless of whether a general law could or could not have been crafted.*[17]

## B.

### The Facial and "As Applied" Invalidity of a Statute

¶ 9 Nonconformity of a statute to the constitution's command may be either *facial*[18] or lie solely in the *law's application.*[19] This case does not implicate the facial fundamental-law orthodoxy of *any statutory texts* here in contest but rather the impermissible *impact of their flawed application.*

¶ 10 **An "as applied" challenge seeks relief from a specific application of a *facially valid statute* to an individual (or class of individuals) who is under an allegedly impermissible legal restraint or disability as a result of the manner (or circumstances) in which the statute has been employed.**[20] The attack launched under this rubric contemplates a *factual analysis* of the case to determine the circumstances in which the enactment has been utilized and to consider whether in those particular circumstances the employment deprives anyone to whom it was applied of a protected right.[21] While a law found deficient in its application to one plaintiff cannot be enforced against

that person, it would escape the judiciary's *general condemnation of invalidity.* A facially unconstitutional statute, on the other hand, is void from its inception and cannot provide a basis for any claim of right or to any relief.[22] It confers *no* rights, bestows *no* power on anyone and justifies *no* act performed under its aegis.[23] A facial attack mounted in a judicial forum should not generally be entertained when an "as applied" challenge could resolve the controversy.[24]

## C.

### The Impact of State ex rel. Macy v. Board of County Commissioners[25]

¶ 11 For blanket validation of the contract in contest TCCJA's brief appears to rely on this court's failure to condemn in *State ex rel. Macy* a potentially asymmetrical regime imposable by the provisions of 19 O.S.1991 §§ 1401 et seq. (the County Budget Act). The act authorizes, but does not require, counties *to opt for the creation of a budget board.*

¶ 12 In the Art. 5 § 46 sense, *Macy* gave neither approval nor disapproval to the *selective regime* for creating a budget board form of county governance. **No one in *Macy* challenged—on § 46 grounds—the poten-**

---

17. Although directed to the legislature, the terms of Art. 5 §§ 46 and 59 are equally binding on the courts. *Reynolds, supra* note 10 at 822. Our own jurisprudence, no less than the legislature's enactments, must faithfully conform to the fundamental law's prohibition against disuniform (or non-uniform) laws on prohibited subjects. *Id.*

18. *St. Paul Fire & Marine Ins. Co. v. Getty Oil Co.,* 1989 OK 139, ¶ 10, 782 P.2d 915, 917; *State v. Board of County Comm'rs,* 188 Okl. 184, 107 P.2d 542, 544 syl.1 (1940). *See also, Texas Workers' Compensation Com'n v. Garcia,* 893 S.W.2d 504, 518 (Tex.1995).

19. *See in this connection Garcia, supra* note 18 at 518 n. 16; *Nelson v. Krusen,* 678 S.W.2d 918, 922–23 (Tex.1984) (the court declares constitutionally infirm a two-year medical malpractice statute of limitations *as applied* to a plaintiff who during the prescribed period could not have discovered the injury).

20. *Renne v. Geary,* 501 U.S. 312, 323–24, 111 S.Ct. 2331, 2339–340, 115 L.Ed.2d 288 (1991). An "as applied" challenge may also seek injunctive relief against future application of the statute or ordinance in the allegedly impermissible man-

ner shown to have been invoked for employment in the past.

21. *See, e.g., Broadrick v. Oklahoma,* 413 U.S. 601, 615–16, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973); *Tobe v. City of Santa Ana,* 9 Cal.4th 1069, 40 Cal.Rptr.2d 402, 892 P.2d 1145, 1152–53 (1995).

22. *St. Paul Fire & Marine, supra* note 18 at 917; *Board of County Comm'rs, supra* note 18 at 544 syl. 1; *Casares v. State,* 768 S.W.2d 298, 299 (Tex.Crim.App.1989) (quoting *Rose v. State,* 752 S.W.2d 529, 553 (Tex.Crim.App.1987); *Reyes v. State,* 753 S.W.2d 382, 383 (Tex.Crim.App.1988).

23. *Reyes, supra* note 22 at 383.

24. In *Renne, supra* note 20, 501 U.S. at 323–24, 111 S.Ct. at 2340, the Court suggests that a lower court faced with an *"as applied"* and a *"facial"* challenge can, and probably should, avoid deciding the *"facial"* challenge if the law *"as applied"* is unconstitutional and the decision on that point resolves the controversy between the litigants.

25. *State ex. rel. Macy v. Board of County Com'rs,* 1999 OK 53, 986 P.2d 1130.

tial for disuniform operation of the county budget board act. *The impact of that act on the § 46 uniformity mandate was not pressed for resolution. It hence escaped the court's fundamental-law scrutiny.*

## III

### THE ESSENCE OF THE § 46 INFIRMITY THAT TAINTS THE TULSA COUNTY JAIL OPERATIONS

¶ 13 By the Board's own admission at oral argument,[26] the TCCJA contract strips the sheriff of all control over the county jail operations. This is the essence of the § 46 infirmity here.

### A.

#### *The Vice In The Statutes' Application*

¶ 14 The vice to be remedied here is not in the delegation to a stranger of powers vested in a unit of government, but in a contractual arrangement between a county entity and a private operator which divests a law-empowered county official of all authority over the contract's subject matter—the operations of the county jail. By the TCCJA contract the county official in charge of the local jail—the sheriff—has been taken completely out of participation in the control of the facility's management as well as divested of oversight over any correctional discipline of the inmates' conduct.

¶ 15 It is the actual transfer of all control over the jail facility by the contract's elimination of the sheriff's oversight authority that *offends the symmetry intended by § 46. That section absolutely commands that all county officials who hold the same office in the State have the very same powers and*

*duties.* **The impact of privatizing the Tulsa County jail creates a disuniformity by which the sheriff is singled out for enjoyment of lesser powers than those possessed by other sheriffs in the State.** It is not to be denied that the legislature may *abolish* the office of the sheriff in *all* counties. *But so long as that office continues to exist its range of duties must be uniform in every county of the State.*[27]

¶ 16 The dichotomous division that results from today's decision leaves the sheriff in unprivatized counties fully in command of the local jail but singles out that office in Tulsa County for a different job description. TCCJA's *contractual misapplication* of uniform law hence creates a *local departure* which is violative of § 46. *That is the essence of the vice to be remedied here.*

### B.

#### *The Infirmity's Removal*

¶ 17 It is not the act of "privatizing" the jail that is infirm; rather, the vice consists solely of depriving the sheriff of his oversight control. **This infirmity in the statute's application could easily be removed by a contract's amendment that could be imposed** *ex lege.* **That amendment would leave the private operator in charge of the day-to-day management, but would place the ultimate oversight over prisoners' discipline and over the facility's operations in the hands of, and under the standards imposed by, the sheriff.**

¶ 18 Aside from the mischief of injecting disuniformity with grave constitutional implications, a contractual elimination of the sheriff's control utterly lacks any supportive statutory warrant.[28] When privatizing was

---

**26.** Much like a party's admission in the brief, its concession at oral argument will also serve to supplement the record. *Macy, supra* note 25, ¶ 3, at 1133 n. 8; *Strelecki v. Oklahoma Tax Com'n,* 1993 OK 122, ¶ 16, 872 P.2d 910, 919; *Reeves v. Agee,* 1989 OK 25, ¶ 24, 769 P.2d 745, 753–754; *Womack v. City of Oklahoma City,* 1986 OK 14, ¶ 10, 726 P.2d 1178, 1181 n. 8; *Timmons v. Royal Globe Ins. Co.,* 1985 OK 76, ¶ 8, 713 P.2d 589, 592 n. 10.

**27.** The teachings of *Sanchez v. Melvin,* 1966 OK 116, 418 P.2d 639, **on which the court places today its unwarranted reliance,** are not in discord with my analysis. Under attack there was not disuniformity in subject matter jurisdiction of

justice-of-the-peace courts but only in their territorial reach (in Tulsa and Oklahoma Counties) of less than an entire county. Section 46 does not impose a uniformity mandate for a county-wide territorial competence of every justice-of-the-peace court. This court correctly concluded that the *assailed local legislation* did not offend § 46.

**28.** *Neither* of the enactments tested today for constitutional orthodoxy *prohibits the inclusion of a contractual phrase that would subject the private jail entity to the sheriff's oversight.* Nor does the underlying legislation *authorize* the privatizing agency to invest the private contractor with *exclusive control* over the county jail opera-

accomplished neither the Board of County Commissioners in Tulsa County nor TCCJA was vested with power to control the jail or the authority to oust the sheriff and transfer his control to the private contractor.[29] As one of the common law's ancient guiding beacons eloquently teaches, *nemo dat quod non habet*—one cannot give that which one does not have, *i.e.*, no one can give a better title to a thing than one possesses.[30]

## IV

## SUMMARY

¶ 19 While TCCJA's power to "privatize the jail"— *i.e.* to place the management of that facility in a nongovernmental entity— may indeed be impervious to the constitutional attack launched here, the act of entrusting that operation to one who is positioned *beyond* the reach of the sheriff's oversight control. creates a disuniformity that is fatally offensive to the § 46 command against "local" law on two of the twenty-eight subjects included in the cited section—the *uniform regulation of county affairs* and the *uniformity of powers to be possessed by county officials.* In short, **the TCCJA contract not only lacks a statutory warrant for the sheriff's ouster of control, but also injects an impermissible asymmetry into the range of uniform powers possessed by sheriffs over the State.** That fundamental-law infirmity could be excised by a law-imposed amendment which would restore the sheriff's complete oversight over the business man-

agement function as well as over the correctional aspects of the local jail operation.

---

tions by *extinguishing* the sheriff's statutory powers. *In short, there is absolutely no statutory warrant for a contractual displacement of the sheriff.* See the pertinent text of 57 O.S.1991 § 41 and 19 O.S.1991 § 744(A), *supra* notes 4 and 5.

29. The Board of County Commissioners and TCCJA invested the private contractor with powers that lay beyond those conferred on them by statute. *See Workers' Compensation Court v. Merit Protection Commission,* 1993 OK 145, 863 P.2d 1226, 1227; *Marathon Oil Co. v. Corporation Commission,* 1994 OK 28, 910 P.2d 966, 969–70; *Chiles v. Children A, B, C, D, E and F,* 589 So.2d 260, 263–264 (Fla.1991) (powers vested in one office of government may not be passed by it to another agency).

30. *Mitchell v. Hawley,* 83 U.S.(16 Wall.) 544, 550, 21 L.Ed. 322 (1872); *Snethen v. Oklahoma State Union of Farmers Educational and Co-op. Union of America,* 1983 OK 17, 664 P.2d 377, 381. The ancient principle dates back to Justinian's Digest, and apparently comes from a phrase credited to the Roman jurist Ulpian *"nemo plus iuris ad alium transferre potest quam ipse habet"* (no one can transfer more legal rights than one has). *See* Milsom, Historical Foundations of the Common Law 331 (Butterworths 1969); Carl S. Bjerre, Secured Transactions Inside Out: Negative Pledge Covenants, Property And Perfection, 84 Cornell L.Rev. 305, 333.